### PRICE et al. v. YELLOW PINE PAPER MILL CO. (No. 762.)

(Court of Civil Appeals of Texas. Beaumont. Feb. 27, 1922. Rehearing Denied March 15, 1922.)

1. **Damages ☞52 — Recovery cannot be had for fright unaccompanied by any other injury.**

No recovery can be had for mere fright which is neither attended nor followed by any other injury; but where physical injury, such as sickness, insanity, miscarriage, etc., results from fright or other mental shock caused by the willful act or omission of another, which is the proximate cause of the injury, and the injury ought to have been foreseen as a natural and probable consequence thereof, the injured party can recover.

2. **Damages ☞208(2)—Negligence ☞136(25) Cause of injury by fright held for jury.**

Questions whether physical injury results from fright or mental shock caused by willful act or omission of another, whether act proximate cause, and whether injury ought to have been foreseen, generally, are questions for jury.

3. **Appeal and error ☞927(7)—Evidence considered favorably to plaintiff in determining propriety of directed verdict.**

In determining the propriety of directing a verdict for defendant, the evidence must be considered most favorably to plaintiff, disregarding the conflicts and contradictions, no matter how strong or how much in conflict the contradicting evidence may have been.

4. **Master and servant ☞332(2)—Employer's liability for act of manager taking injured employé home held for jury.**

In an action by a wife of a servant, joined by her husband, against the master for injuries to the wife resulting from fright and mental shock caused by defendant's general manager taking the husband to his home in a bloody, bruised, and mashed up condition, whether the act of taking the servant home was done in the performance of a duty defendant owed husband as employé, or whether it was done as a matter of custom in the operation of the business, and whether the general manager was acting within the scope of his authority, held for the jury.

5. **Master and servant ☞351—Employer liable for negligent performance of duty under contract with compensation insurer.**

Where a master provided a method of caring for injured employés by means of insurance taken under the Workmen's Compensation Act (Vernon's Sayles' Ann. Civ. St. 1914, arts. 5246h–5246zzzz), but under its contract with the insurance association was under duty to act when an employé was injured, that duty must not be negligently performed; and the master is liable for causing physical injury to a workman's wife shocked when he is brought home in a wounded condition.

6. **Negligence ☞8—Miscarriage resulting from fright held actionable.**

A petition for damages to wife of employé resulting from fright and mental shock caused

by act of master in taking the husband home in a bloody, bruised, and mashed up condition without warning her, though her critical condition was known, with the result that she suffered a miscarriage. *held* to state a cause of action.

### On Motion for Rehearing.

**7. Damages ⊜208(2)—Whether taking bloody employé home caused miscarriage to wife held for jury.**

In action by wife of employé against master for injuries resulting from fright and mental shock caused by the bringing home of the husband in a bloody and mashed up condition without warning after an accident, resulting in a miscarriage and sickness, whether the act of the master occasioned the injury *held* for the jury.

Error from District Court, Orange County; J. Q. Adams, Judge.

Action by Mary Price and husband against the Yellow Pine Paper Mill Company. Judgment for defendant, and plaintiffs bring error. Reversed and remanded.

David E. O'Fiel and R. A. Wood, both of Beaumont, for plaintiffs in error.

Holland & Holland, of Orange, for defendant in error.

O'QUINN, J. Mary Price, joined by her husband, R. A. Price, sued the Yellow Pine Paper Mill Company for damages to Mrs. Price, resulting to her from fright and mental shock caused by George S. Holmes, the general manager of the defendant company, taking R. A. Price, who was an employé of said company, to his home in the evening of October 6, 1916, bloody, bruised, and mashed up, resulting from an accident in the paper mill, without any warning to Price's wife, and she, being in an advanced stage of pregnancy, was so shocked and frightened at the sight of her husband's plight that she miscarried some few days later.

Plaintiffs' petition, among other things, alleged, in substance, that R. A. Price, husband of Mary Price, was an employé of defendant on October 6, 1916, and while engaged in the performance of his duties was injured by the falling in of a brick furnace in which he and others were working; that he received various cuts, bruises, and wounds, from which he became very bloody, and was caused to bear a frightful appearance; that, immediately after the accident occurred, George S. Holmes, who was defendant's general manager, took charge of the situation, and directed the giving of first aid to the injured, and that in so doing he was acting within the scope of his authority; that said R. A. Price was so injured that he became unconscious and was not mentally capable of suggesting or directing as to what disposition should be made of him in

his said condition, and that, being in such condition, it became the duty of the defendant to make such disposition of him as would not, under the circumstances, be injurious to others, and that defendant, acting through its said general manager, did undertake to render first aid to plaintiff R. A. Price and to make disposition of him; that defendant, acting by and through its said general manager, caused the said R. A. Price to be placed in an automobile to be carried from the scene of the accident to his (Price's) home, and that while on the way to his said home he (Price) became conscious, and protested to said Holmes, who was driving the automobile, against being carried home in his bloody and wounded condition; that he told said Holmes that his wife, Mary Price, was in an advanced stage of pregnancy, and in no condition to see him in his bloody condition, and that he would get out of the car, but that said Holmes carried him on to his home and put him out of the car in full view of his wife, Mary Price, who became so frightened and excited by his bloody plight that she became sick, and continued to suffer until she miscarried, and which sickness and miscarriage was caused by the careless and negligent act of said Holmes, after he had been informed of the critical condition of said Mary Price, and which said careless and negligent act of defendant was the direct and proximate cause of her said sickness and miscarriage.

The defendant presented a general demurrer, and numerous special exceptions to the plaintiffs' petition, which were overruled. Defendant also, by way of answer, denied all the allegations of plaintiffs' petition, and specially answered that it was a subscriber to the Texas Employers' Insurance Association of the State of Texas, and that plaintiffs would have to look to said insurance association for all damages growing out of the injuries sustained by said R. A. Price while in defendant's employ; that any duty owing to the said R. A. Price to take care of or dispose of him after his alleged injury was owed to him and due to him by said Texas Employers' Insurance Association, and not by the defendant, and that any duty owed to Mary Price was owed to her by said insurance association, and not by defendant.

The case went to trial before a jury; but, when the testimony was closed, the court instructed a verdict for defendant, upon which judgment was rendered, and from which plaintiffs appealed.

Mrs. Mary Price, plaintiff, among other things, testified as follows:

"My name is Mrs. Mary Price. I am the plaintiff in this suit. On or about and prior to October 6, 1916, I lived in the Bruner addition in Orange county, Orange, Tex. I had been

living in Orange county and at Orange for about 11 months prior to that time. R. A. Price is my husband. We had been married about 14 years up to that time. My husband was employed by the Yellow Pine Paper Mill Company at and before October 6, 1916. I do not know what he was doing for them, what his job was. I had been a mother before that time. I had been the mother of six children at that time. I was about six months and some few days advanced at that time, October 6, 1916. Something happened on that day. My husband got hurt while he was working in the furnace at the paper mill. The furnace fell in on him, and Mr. Holmes brought him to our home, and I saw him. His head had been all bloody, and it shocked me; I had a terrible shock. After I had this shock, I was nervous and trembling. I was sick, and I was sick all that night, and my husband was there sick, and I stayed up with him, but I was sick all that night, and the next day I was sick, and Dr. Phillips came out there, and I told him I was sick. We had to have Dr. Phillips come to see me that night and the next day, and the next night the baby was born. I was sick and have been sick ever since. I was in a terrible unhealthy condition; I was almost dead. I went over to New Orleans to the Charity Hospital and stayed over there a long time. After the birth of my child, I was in bed about 15 days, and I was sick about 6 months. After the baby was born, my periods stayed on me; I didn't get well of that. I stated to the jury that I had been a mother before and had given birth to six children. I never suffered a miscarriage before in my life."

On cross-examination:

"As to where I was in the house when my husband came home on that day, will say, I was standing in the door. I heard a car coming, and I went to the door to see who it was. Mr. Price got out of the car. He walked into the house. I don't know which seat of the car he was in. I never saw him until he was climbing out of the car. He was climbing out at the side when I saw him. I was so excited, I don't remember whether he got out from the front or the back of the car. I don't remember whether he got out back of Mr. Holmes from me or not. I was so excited, I don't remember which side of the car he got out on. I reckon the car was 30 or 40 steps from the house. There is a fence around the house. He had to come in the gate after he got out of the car. It was about 2 or 3 steps from the porch to the gate; then there is the street, you know. There was nobody else in the car besides Mr. Holmes and Mr. Price when they came up there. As to how long I came to the door before the car got there, will say, I heard the car coming, and I went to see who it was coming to the house. The car was 30 or 40 steps down the road, I guess, when I got to the door. That was between 3 and 4 o'clock in the evening, I suppose; I don't remember just what time it was. There was nobody else in the house besides myself. Nobody else came up while Mr. Price was coming up. Mr. Price laid in the bed next day after he came home. He laid in the bed all day; he didn't get up at all. I think he got up the day after that. He didn't get very much waiting on while he was in the bed. My sister came out there and did what little she could for him, and my brother-in-law, John Moore. I don't just remember how long my brother-in-law stayed over at the house when he first came over; he lived right at us. He didn't stay all day; he had to work, and he had to sleep. He had to sleep in the daytime and work at night, and he couldn't stay but a few minutes at the time when he would come in. I don't remember whether he worked the night after my husband was hurt or not. My husband was working in the daytime and my brother-in-law worked at night all the time. I don't have any idea how long my brother-in-law stayed over there; I was so excited because my husband was hurt; I thought he was nearly killed. * * * There wasn't any supper cooked that night. My little girl cooked breakfast the next morning; there wasn't very much breakfast cooked. My girl was 12 years old at that time. That was my oldest child. My youngest one was 2 years old. I did not call a doctor for Mr. Price as soon as he came in. I asked him if he had seen the doctor, and he said no, the doctor would be out there as quick as he could get out there, and I didn't call the doctor.

"Dr. Pierce and Dr. Phillips came out there between sundown and dark, I think, as well as I can remember. I was so nervous and excited until I can't remember very well; but, as near as I can remember, Dr. Pierce and Dr. Phillips came out between sundown and dark. They didn't stay long; about 30 minutes, I guess. Mr. Price was in bed when they came there. He did not get up while they were there. The doctor didn't come back until the next evening. I thought Mr. Price was going to die, he was so sick and hurt and everything, and looked so pale. I just kept somebody running to the 'phone all the time, trying to get the doctor, and late the next evening, just about dusk, Dr. Phillips came, and he examined Mr. Price's chest and back, and said there was several broken bones, two or three, I don't remember just how many, and he bound him up with plaster and he wanted me to help him, hold the lamp for him, and kinder help him raise Mr. Price up. He couldn't raise up at all. I would sit the lamp down and sit down every minute, because I was so sick I couldn't stand on my feet at all. That was not all the visit the doctor made. Dr. Pierce was out there twice, I think. I don't remember how many times Dr. Phillips came, several times. There was no doctor out there between that first visit that Dr. Pierce and Dr. Phillips made out there and the visit that Dr. Pierce made alone. That night, as I started to tell you, I was so sick I couldn't hold the lamp for him, and he finally scolded me because I wasn't helping him as well as I ought to. The doctor came to me that night; I had him with myself. He didn't wait on Mr. Price that night. He fixed him up that night before he left. He made a second visit that same night for me, but didn't wait on Mr. Price. The next morning the doctor came back to see both of us. He waited on Mr. Price the next morning and me too. Mr. Price showed a good deal of suffering after he got home. He complained of his suffering a right smart. He showed signs of suffering that night. He suffered all night. He groaned and complained a right smart the next day. He didn't groan and take on so much, but he looked so deathly pale. Every time he would move, he would,

groan. All this groaning and pain he showed did not excite me much. His groaning didn't have any effect on me, because I was already sick. As to whether or not the fact that I thought he was about to die didn't have any effect on me and didn't excite me, will say, I was already as excited as much as I could have been; I was almost unconscious the next day. His groaning, etc., the first day didn't have any effect on me, didn't make me nervous and excited; I was already sick and as nervous as I could be. It was the first shock that made me that way; knowing he was hurt is what hurt me. Of course, his suffering affected me some after that. After the first excitement was over with, I was as nervous and weak as I could be. As to whether or not waiting on him didn't make me nervous and excitable, will say, I didn't wait on him. I didn't do anything for him that first night except sit on the side of his bed and wring wet towels. I was just in a kind of daze, seemed like, in a shock, and I just sat there on the side of his bed and watched him and put cloths on his chest and rubbed liniment on him. That first shock was just like electricity would shock a person, when I saw him hurt that way; it was just a nervous shock. I wouldn't have gotten over that first shock if I had found out he wasn't hurt at all; I couldn't have gotten over it because the mischief was done all on one second. I guess his complaining and groaning had some effect on my nerves, because I stayed that way. I was sick six months. In fact, I haven't been well at all since. I am healthier now than I have been."

### Redirect:

"Prior to the time my husband was brought home, I was progressing all right in my condition. I was getting along all right. I was getting along nicely and my health was good; I wasn't sick no way."

### Recalled:

"I stated this morning that I had been a mother six times. I had never before during the course of my married life had the misfortune to have a mishap as I detailed this morning. I was all right in my advancement of pregnancy up until that time. I was in good health. I had not strained or hurt myself in any way prior to that time. I had never been frightened or shocked in such a manner as this at all before that time."

### R. A. Price testified:

"My name is R. A. Price. I am the husband of Mrs. Mary Price, the lady who was just on the stand. We have been married about 18 years. I am living with my wife now. I have been living with her since October 6, 1916, up to now and before that time. On October 6, 1916, my wife was in a condition known as being 'pregnant.' I was working for the Yellow Pine Paper Mill at that time, and had been working for them for 10 or 11 months. I was millwright for them. My family and I lived over in Bruner addition, here in Orange, Tex. I was hurt down there at the Yellow Pine Paper Mill on or about the 6th of October, 1916. I don't know what time of day I was hurt. It was somewhere after 1 o'clock in the evening. I didn't have any watch, and don't know what minute it was. Of course, I don't know the exact time I was hurt. I just know approximately the time. As the result of being hurt, my shoulder blade was broken right there, a rib was broken along right there, and three of my ribs right here, and the side of my head was skinned from here down to here, and there was a big gash cut across my shoulder. The side of my head was bloody. I was bloody all over. My shoulder was bleeding. I had a big gash cut in my shoulder here. I stated that my head was skinned. I was skinned from here plumb down to my side. I was bleeding from that skinned place on my head and side. I got hurt by a furnace falling in on me. I was on duty for my employer at the time I got hurt. I was doing what my occupation called me to do. Three of us were hurt at the same time. There was two or three men in there with me. One of them was in there, and the other one was looking in when it fell in; it knocked him in. I was not able to help myself as a result of being hurt. After I was hurt, they carried me out and put me on a run, walk, outside of the paper mill. They laid me down on a platform walk. Then the clothes I had on were changed, and I was carried from there to the office, and carried home. Mr. Holmes, the gentleman in the courtroom, carried me home.

"At the time I was being carried home and just before, I didn't know what was being done with me and what disposition they were making of me. I first learned that they were taking me home when Mr. Holmes started across the Bruner Bridge with me. The bridge had bounces in it, and, when the car began to cross it, it seemed like it tore me all to pieces in here. I was groaning, and he asked me if I was hurting, and I told him he would have to slow down. Mr. Holmes carried me on towards home. Before we got home I told him I didn't want to go home, not to take me home. He asked me where I lived, and I told him, and we were going on and got up to the corner, and I told him to let me out. He asked me if my wife was very excitable, and I told him no, she was not very excitable, but she was in the family way, and not in any condition to see me. There wasn't anything done by Mr. Holmes when I told him my wife was in that fix. He did not let me out of the car. When I had the conversation with Mr. Holmes, just referred to, the car was running. I was in the front seat of the car. Mr. Holmes was running the car. He did not make any reply to me when I told him my wife was not in any condition to see me. He then went on around in front of my house and put me out. He opened the door of the car, and I stepped out. My brother-in-law came out there and asked me what was the matter, and Mr. Holmes told him a furnace fell in on me, and he went on in the house with me, the best I can remember. My wife was in the door when I got there. Mr. Holmes was the general superintendent of the Yellow Pine Paper Mill Company, the defendant company in this suit, at that time. I suppose Mr. Holmes was over in the office at the time the accident happened. I don't really know of my own knowledge just where he was. After the accident happened, when I saw him, he was over at the office. I don't know how many people worked at that paper mill at that time;

I guess there was 300 or 400 people working there. There was at least 300 working there at that time. I worked 10 hours a day. I went to work at 7 and quit at 6. The other employés there went to work and quit at the same time I did. I saw the number of people that worked there everyday. * * * While I was there, I believe there was only one man hurt besides myself. The best I can remember, I think that was about a month before I was hurt. There was no one else over Mr. Holmes as manager and superintendent in the Yellow Pine Paper Mill Company out there. Mr. Holmes was general manager and superintendent. There was nobody out there over him then that I know of who had the control and management of that outfit. I never saw anybody out there who was over him. On that occasion when the other man was injured that I speak of, they took him home, I guess; they left with him. They took him home."

Cross-examination:.

"I did not go with them on that occasion. That man lived over in the north end of town. I was working at the mill at the time he was hurt. I know they left with him, and he said they took him home. I said awhile ago I knew of my own knowledge that they took him home. I did not go with them. After they left the paper mill, I saw them until they went out of sight. I don't know how far that was from the paper mill. I think Mr. Bailey Hunter's car took him home. Mr. Bailey Hunter was the superintendent of the pulp department. * * * As to whether or not I don't know of my own knowledge that they took him, will say, that is, what they said about it. They took him home. I don't really know where they went with that man; I don't suppose they threw him away. They took him away from the mill; I know that. I didn't go to his home with them, of course, but they took him away from the mill. I don't know what they did with the man; they said they took him home. Mr. Bailey Hunter was an employé of the paper mill, and I think he is the man that took him away from the mill. Mr. Holmes did not take him home. The paper mill, of course, didn't take him home. The general superintendent did not take him home. The superintendent of the pulp department, the best I can remember, took him home.

"When I was hurt, they put me out on that platform around the incinerator. I don't remember now who put me there. Some of the people that got us out of the furnace put me there; I don't remember who it was. I did not change my clothes there. As to how long I stayed there before I changed my clothes, will say, I think it was somewhat around between 3 and 4 o'clock when they started home with me; I don't remember what time it was. I changed my clothes there at the mill; I pulled off the ones I had on there at the mill. I had on a thin shirt and a pair of overalls. I think they washed my face; I don't remember. I couldn't tell you where I washed it; I didn't wash it; some of the rest of them washed it. I had my clothes in a little clothes closet that was made there for the hands to keep their clothes in. It was after I went to work after dinner that I got hurt. I did not put my clothes on myself. I don't remember now who went to the office with me; there was lots of people around the mill at the time it was done. I walked around there. I stayed there at the office two or three minutes before I started home. I did not start on home walking. They told me at the office to get in the car and they would take me home,. and I told them I didn't want them to take me home; whenever I got ready to go home, I would walk home. They told me to get in the car; I couldn't walk home, and I got in. Mr. Holmes is the man that drove the car off. He was in the car when I got in. He got in before I did. They told me to get in the car and he would take me home; and I got in and sat down, on the front seat with him, and he started on home with me. They had already washed my face and my hands, and had changed my clothes. They changed my clothes for me; I couldn't raise my arm up. Certainly I could stand up; there wasn't anything hurt about my legs. My walking qualities were all right.

" * * * I don't know what time it was. I know it was soon after the noon hour that I got hurt, and I went home somewhere about 3 or 4 o'clock. I don't know how long I stayed out on that walk. I didn't do anything between the time I was hurt and the time I went home except change clothes and go to the office. The rest of the time I laid on the walk. I did not go over there and see that other man that was hurt; I didn't know where they were at. As to what my idea was in walking over to the office, will say, they kinder carried me over there. I said awhile ago that I walked over there, but they were with me. Mr. Reynolds is the one that came and got me, and took me by the arm. I do not know what they carried me over there for. They told me to come and go to the office. When I got over there, Mr. Reynolds said there would have to be something done with me; they had better get me to a doctor. Mr. Holmes did not ask me if I wanted him to take me home in the car. He told me to come and get in the car and he would take me home, and I told him I didn't want him to take me home; when I got ready, I would walk home. He told me to come on and get in the car and he would take me home, and I got in the car and he took me home. I did not state that I was unconscious all this time. I have a recollection of getting in the car all right. I was not unconscious when I walked over to the office; I came over there with Mr. Reynolds. I wasn't unconscious when I got home. I said, when I got to the corner of the block near my home, I told Mr. Holmes to let me go; that I would walk. I had three brothers-in-law living right there close, and I was aiming to stop at one of their houses; I was going to stop at one of their houses, because I didn't want to go home where my wife was. I didn't want her to see me at all. If I had gone to one of their houses, I was aiming to let some of them go and tell my wife I was hurt and wouldn't be home. I thought it would be better on her for somebody to go and tell her. I asked Mr. Holmes to let me out of the car; I didn't try to make him let me out. The car stopped out in the street, and my gate opens right out on the street. My house is right close to the street. I got out of the car and walked on in. My brother-in-law came on out there, and he walked on in my house with me and pulled my clothes off. When I

got to the house, I didn't say anything about going on anywhere else; I didn't want to go any further. I was in bed about three weeks. As to whether or not I didn't get up when my wife said I did, will say, I got able in two or three days to sorter sit up; but I didn't get up and do anything. I made a claim to the Texas Compensation Insurance Association for compensation for my injuries out there. As to whether or not I did that because at the time I got hurt at the paper mill the paper mill was carrying compensation insurance for its employés, will say, I don't know what they were carrying; they held insurance out of my wages every two weeks, and said it was insurance money. It is a fact that I made an affidavit when I put in my claim for compensation. A few days after I was hurt they sent me a letter. I think they sent me a paper to fill out, and Dr. Phillips filled it out. I suppose they sent it off. He took it off with him from my house. I guess the Industrial Accident Board passed on my case for compensation. I don't know whether I have got a suit against them now or not. I think my lawyers brought suit against them; that is what they told me. It has been laying here two years, and nothing has been done with it. I accepted the benefit of the insurance at that paper mill. I knew at the time I was injured they were carrying insurance for me, because they took money out of my wages."

Redirect:

"I stated awhile ago that, when I told them I didn't want to go home, that I would walk home when I got ready to go, they told me to get in the car; that I couldn't walk home. Mr. Reynolds told me that. Mr. Reynolds is the timekeeper at the paper mill. Mr. Holmes was in the car when I got in. Mr. Reynolds assisted me to the car. I was not able to use my arms. I had them in a sling for a long time afterwards. * * * I have stated to the jury that I told Mr. Holmes not to take me home; that my wife was in such a fix that she couldn't see me like I was. Mr. Holmes paid no attention, and went on to the house with me anyway. He carried me home. I did not offer him any physical resistance; I wasn't able to do it. When I arrived at the house, my wife was standing in the door."

Cross:

"As to whether or not I got out of that car without using my hands at all, will say, Mr. Holmes opened the door and I stepped out. I did not brace myself with either arm. I didn't step out of the car with my arms up like that, but I stepped out without using my arms at all. I didn't touch the car when I stepped out. I said I didn't attempt to use any physical force to keep Mr. Holmes from taking me home. As to whether or not I urged him not to take me home, will say, I told him not to take me home, and he told me to come on and get in the car. I also stated that I waited until I got to the corner of the block where I lived and I told him then not to take me home, that my wife ought not to see me; that is all I said. When he didn't stop the car then, I made no further objection, just went on."

Mr. Peterson, witness for plaintiff, among other things, testified:

240 S.W.—38

"I live in Orange. Both before and after October, 1916, I lived here in Orange. I was in the transfer business at that time. I just know Mr. Price, one of the plaintiffs in this case, when I see him. I had met him and had taken him home several times in the car. I saw Mr. Price at the paper mill about October 6, 1916. I saw him about 3 or 4 o'clock in the evening of that day; I was out there in my car, sitting down there in front of the office. I know Mr. Holmes and knew him at that time. He was superintendent, if I have it right, of the paper mill. I was sitting there in front of the office and heard an awful racket and heard someone holler. A furnace fell in on Mr. Price that afternoon. A traveling man was fixing to get in the car, and we all ran over there. I was about the first one there, and all I could see was somebody's legs sticking out from under the brick. Mr. Price was one of those men. I saw him after he had gotten out from there. They carried him out and laid him on a little plank walk. I couldn't really tell what his condition was. I heard him hollering and going on; looked like he was pretty badly bunged up. There was mortar and stuff off of the brick on him, and he was skinned up. I didn't go much closer to him than I am to you. He was bleeding on the side of his face or nose. I didn't take much notice of him. He was lying up there with his hands across his breast, hollering. I couldn't say whether he was unconscious or not. I stayed there until we got them all out and laid them down, laid Mr. Brown down and the other fellow. I heard the office crew 'phone and try to get an ambulance or car. I think it was Mr. Reynolds that I heard. I couldn't say what Mr. Reynolds' business is out there, unless it is timekeeper. He used to be night watchman when I worked out there. I never noticed whether Mr. Holmes was out there or not. I don't remember seeing Mr. Holmes around there where this man was hurt. Mr. Price was pretty badly bunged up all right. I said I was in the transfer business then. I have been in the transfer business off and on for about 18 years. I was in the transfer business here, in Orange, Tex., just before October 6, 1916. I don't know how many men were working at the Yellow Pine Paper Mill at that time. I have no approximate idea. There was a good bunch down there, but I couldn't say just how many. There was a hundred or more. I have done considerable transfer work for the Yellow Pine Paper Mill Company. After I went into business for myself, I would send down there and get somebody that was hurt and take them home. When we sent a carriage down there, the company always paid us for our work. They would 'phone for a carriage for somebody that got hurt or was sick or something, and they paid us. It was a matter of right frequent occurrence then for them to 'phone for somebody to come out there and get somebody that was hurt and take them home. I believe I saw three men that were hurt at the paper mill on October 6, 1916. I knew two of them. * * *"

Cross:

"I am sure that was Mr. Price that was laid out there on that walk. I stated that I sent out several times for the paper mill and

got men that were injured, and I went once or twice myself. I hadn't been out there after a man before that myself in seven or eight years, but I sent out there. All the rest I know anything about anybody going out there is not just what somebody told me. I was running a stable, and they would 'phone for a carriage to come out there and get somebody that was hurt and take them home. I suppose it had been a month, or something like that, since I had sent a carriage out there to take a man home. It happened every two or three weeks that they would have to send a man home that was sick or hurt."

H. A. Beck, witness for plaintiff, testified, in part:

"My name is H. A. Beck. I live in Orange, Tex. I have lived here about 12 years. I lived here on or about October 6, 1916. I was working for the Yellow Pine Paper Mill Company at that time. I am working there now. Mr. George S. Holmes was the manager and superintendent of the Yellow Pine Paper Mill Company on or about October 6, 1916. That is the gentleman that is in the courtroom here. General manager was his title. He was general manager in charge of the company's plant and property in the city of Orange. I couldn't say whether there was anybody over him or not. There was nobody over him actively on the scene that I know anything about. I was on duty on the day the accident occurred in which Mr. Price was injured. I wasn't present when the accident occurred, but incinerator furnace No. 1 caved in on him. There was three men on the inside of the furnace or got caught in it. I was one of the first ones to get there and help get them out. I would say 275 or 300 men were working for that mill at that time. About the same number were working there 3 months previous to that time. Accidents there at that mill compared very favorably with other industries. They do happen. * * * When a man was injured or hurt out at the plant, it was the custom, if it was a slight injury, to send him home to a doctor; if it was serious, to call a doctor to the plant. In the event a man was disabled so he couldn't travel, a doctor would be called or he would either be sent home or to the hospital. That was the usual and ordinary thing in the business. The company did that."

[1, 2] The action of the court in instructing a verdict is the only question in the case. Evidently the court's action in instructing the verdict was, not because he did not believe that the plaintiffs' petition asserted a cause of action, for in that event he would have sustained defendant's general demurrer and dismissed the case, but, if so, the court was in error. The question of whether damages can be recovered for injuries which are the result of mere shock or fright, when the defendant had not inflicted any bodily injury and had caused no other disturbance to the plaintiff than such fright or shock, is one upon which there is a decided conflict of authority. Generally, it is held that damages for mental suffering, accompanied by physical injuries, negligent-

ly inflicted, may be recovered; but many courts hold that for injuries resulting merely from fright or other mental emotions caused by the wrongful act or omission of another, but which do not accompany such mental emotions, no recovery can be had. The question in Texas seems to be well settled that no recovery can be had for mere fright which is neither attended nor followed by any other injury. Railway v. Trott, 86 Tex. 412, 25 S. W. 419, 40 Am. St. Rep. 866. But where physical injury, such as sickness, insanity, miscarriage, etc., results from fright or other mental shock caused by the willful act or omission of another, and such wrongful act or omission is the proximate cause of the injury, and the injury ought, in the light of all the circumstances, to have been foreseen as a natural and probable consequence thereof, the injured party is entitled to recover, and as a rule these questions are for the jury to determine. Railway Co. v. Hayter, 93 Tex. 239, 54 S. W. 944, 47 L. R. A. 325, 77 Am. St. Rep. 856; Hill v. Kimball, 76 Tex. 210, 13 S. W. 59, 7 L. R. A. 618.

[3, 4] It may be that the court, after hearing the evidence, concluded that the matters complained of in plaintiffs' petition, viewed in the light of the proof offered, failed to show any legal grounds for action, and hence directed the verdict. In determining the propriety of directing a verdict, the evidence must be considered most favorably to plaintiffs in error, disregarding the conflicts and contradictions. They, having introduced evidence tending to support the allegations in their petition, were entitled to have the issue submitted to the jury, no matter how strong or how much in conflict the contradicting evidence may have been. Harpold v. Moss, 101 Tex. 542, 109 S. W. 928; Bonn v. Railway Co. (Tex. Civ. App.) 82 S. W. 810. If the petition stated a cause of action, for the court to take the case away from the jury the evidence must be of such character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it. Choate v. Railway Co., 90 Tex. 88, 36 S. W. 247, 37 S. W. 319. Whether or not the act of Holmes in taking Price to his (Price's) home after the accident was done in the performance of a duty defendant owed him as an employé, or whether the same was done as a matter of custom in the operation of the defendant's business, and whether Holmes was acting within the scope of his authority, were all questions for the jury. Carver Bros. v. Merrett et al. (Tex. Civ. App.) 184 S. W. 741.

[5] Appellee contends that plaintiffs in error based their cause of action upon the alleged duty of defendant in error to care for and dispose of a wounded employé in such manner as not to injure a third person, and says that, if this could possibly be the correct rule of law, as a general proposition, still, that it has no application to the case at

bar, because the evidence shows that defendant in error was a subscriber to the Texas Compensation Insurance Association, and had complied with the Workmen's Compensation Laws (Vernon's Sayles' Ann. Civ. St. 1914, arts. 5246h–5246zzzz) of this state, and thereby had provided a proper and suitable means for taking care of its injured employés, and that whatever duty there was owing to plaintiffs in the premises was owed to them by the said Texas Employers' Insurance Association, and not by defendant in error, and that liability, if any, for damages suffered by plaintiffs, was against said insurance association, and not against defendant in error, and relies upon the case of Producers' Oil Co. v. Green, 212 S. W. 68, as authority for its said contention. In that case the Galveston Court of Civil Appeals held that an employé who called in a physician to treat another employé who was injured was not authorized by the employer to make the arrangement with the physician, and the majority of the court decided that even though the oil company, the employer, had delegated to the employé all the authority to employ a physician possessed by the corporation, the corporation would not be bound by such a contract, for the reason that the company had previously provided a method of caring for such contingencies by means of insurance it had taken out for the benefit of its employés under the Compensation Act, and that not even one of its officers could substitute a different provision or impose a liability on account of services rendered an employé, particularly in the absence of special authority from the board of directors. The Fort Worth Court of Civil Appeals, in Huddleston et al. v. Texas Pipe Line Co., 230 S. W. 250, refused to follow Producers' Oil Co. v. Green, and we find ourselves unable to agree with the conclusions reached by the majority in that case. If defendant in error had provided a method of caring for its injured employés by means of insurance it had taken under the Compensation Act, still under its contract with said insurance association it was under duty to act in the premises, and that duty must not be negligently performed.

[6] We think plaintiffs' petition stated a cause of action, and that the evidence was sufficient to raise a question of fact for the jury. We do not express any opinion as to the sufficiency of the evidence to support a verdict for appellants, but only hold that the petition stated a cause of action, and the evidence was sufficient to raise an issue of fact to go to the jury; and hence that the court erred in directing the verdict for defendant, for which error the judgment is reversed, and the cause remanded.

### On Motion for Rehearing.

At a former day of this term we reversed and remanded this cause. Appellant filed motion for rehearing, which was overruled. At the suggestion and on motion of appellee, we make the following findings of fact, to wit:

"R. A. Price was an employé of the Yellow Pine Paper Mill Company, defendant in error, and while in the discharge of his duty in the course of his employment received injuries, and while in his injured condition and showing upon his person the result of injuries in the way of blood and other evidences thereof, another employé of defendant in error, Yellow Pine Paper Mill Companw, acting within the course of his duty and authorized by the paper mill company, took the injured employé in his automobile to the home of the injured employé, and on the way home the injured employé, Price, told the representative of the paper mill company taking him home that to be taken home in his then condition would be liable to cause his wife a severe mental shock with resulting injuries, and he requested that he not be taken home in that condition, but said representative did take him home in such condition, and the shock to his wife from seeing him brought home in such condition did cause physical injuries for which this action is brought on the part of the wife. The defendant in error was a subscriber to the Employer's Liability Insurance Association under the Workmen's Compensation Act."

[7] To the above, we make the following additional findings: That when the accident occurred by which R. A. Price, husband of Mary Price, was injured, George S. Holmes, who was the general manager of appellee, assumed control in rendering first aid to the injured employés, and said Holmes took said Price in an automobile from the place of the accident to the home of said Price, and that while on the way Price told said Holmes not to take him (Price) home in the condition he (Price) was in; that his wife, Mrs. Price, was in the family way and not in condition to see him (Price) in his then condition, and to let him out of the car, but that Holmes did not let Price out of the car, but carried him on to his (Price's) home; that at the time Price arrived at his home he was bruised and bloody and exhibited external appearances of his injured condition, and Mrs. Price was so mentally shocked and excited at his appearance that she became sick and continued to suffer until she miscarried, and has continued to suffer ever since; that at the time of the accident Mrs. Price was some six months advanced in pregnancy, and that her general health and condition was good up to that time, but has been bad ever since. We further find that the evidence quoted by us in the original opinion herein raises as a question for the jury the issue that the negligence of appellee, acting through its general manager, Holmes, occasioned the injury to Mrs. Price.