## LADIES' BENEV. SOC. OF BEAUMONT v. MAGNOLIA CEMETERY CO. *
### (No. 1134.)

(Court of Civil Appeals of Texas. Beaumont. Dec. 22, 1924. Rehearing Denied Jan. 7, 1925.)

1. Easements ⬅36(1)—One claiming easement without contract or express grant has burden of proving all necessary facts on which right may be presumed.

Burden of proof is on party claiming easement in the land of another, without any contract or express grant, to establish all the necessary facts on which right may be presumed in his favor.

2. Trial ⬅178—Evidence considered most favorably to plaintiff, disregarding contradictions, in determining propriety of directing verdict for defendant.

In determining propriety of directing verdict for defendant, evidence must be considered most favorably to plaintiff, disregarding conflicts and contradictions, no matter how strong or how much in conflict the contradicting evidence may be.

3. Trial ⬅139(1)—Evidence must be such that no other verdict can be rendered as matter of law to warrant direction for defendant.

Trial court is not authorized to direct a verdict for defendant, unless evidence is of such character that as a matter of law no other verdict can be rendered.

4. Dedication ⬅1—Rule as to establishment of dedication stated.

Intent of owner to dedicate land for purpose of highway, road or street must be shown by his acts and declarations, clearly and unmistakably showing that he intended to dedicate land absolutely and irrevocably to use of public, and public must have acted on faith thereof.

5. Dedication ⬅20(1)—Permissive use or mere acquiescence in use of land by public does not constitute dedication.

Mere permissive use of way, or mere acquiescence of owner of uninclosed land in use by public of road or way over it, does not constitute a dedication to the public.

6. Dedication ⬅44—Evidence held insufficient to show dedication of land to public.

Evidence *held* to show merely permissive use by public of roadway, and therefore to be insufficient to create issue for jury as to whether owner dedicated land to public.

7. Highways ⬅1—Rule as to what must be shown to establish right of way by prescription, stated.

To establish right by way of prescription, it must be shown that public exercised uninterrupted use of land such as was reasonably calculated to put owner upon notice that public was using land under claim of right for period of 10 or more years, and that such right was not by license or permission.

8. Highways ⬅159(2)—Evidence held insufficient to create issue for jury as to whether public had acquired right to use roadway by prescription.

Evidence *held* to show that use of roadway was permissive merely, and therefore not to create issue for jury as to whether public had acquired a right thereto by prescription.

9. Easements ⬅1—Deed conveying tract for cemetery purposes and roadway held not to convey fee to roadway, but merely private right of way for use in connection with tract.

Deed conveying by metes and bounds 13 acres to cemetery association, and also a roadway along boundary of tract described, with reference to tract, *held* not to convey a fee-simple title to strip constituting roadway, but merely an exclusive private right of way for use in connection with the tract conveyed for cemetery purposes.

10. Easements ⬅52—Conveyance of tract for cemetery purposes and exclusive private way along boundary held not to create easement in land on other side of roadway.

Deed conveying 13-acre tract for cemetery purposes, and exclusive private right of way along boundary of tract for use in connection with cemetery, did not create easement appurtenant to land on other side of roadway.

11. Easements ⬅52—Owner of land bordering on roadway conveyed by deed referring thereto, held not entitled to easement therein in view of prior deeds of former owner of entire tract.

Where owner of large tract of land conveyed 13 acres to cemetery association, and granted association exclusive private right of way in strip of land along boundary of tract so conveyed, and made no reference to such roadway in deed conveying remainder of tract, subsequent owner on other side had no easement therein, though deed from immediate grantor referred thereto.

12. Corporations ⬅422(2)—Statements by president of cemetery corporation to purchaser of land adjoining roadway held not to estop corporation from claiming right to exclusive use.

Statements by president of cemetery company to agent of purchaser of land adjoining roadway, in which such company had the exclusive right, from which it could not be inferred that roadway was for use of public, *held* not to estop company from claiming the exclusive use thereof.

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted February 25, 1925.

13. Vendor and purchaser ☞229(8)—Owner of land bordering on roadway bound to take notice of deed to owner on other side giving such owner exclusive private right of way.

Purchaser of land adjoining roadway was bound to take knowledge of legal effect of deed, to owner of land on other side of roadway from former owner of entire tract, giving owner on other side of roadway exclusive private right of way in roadway.·

14. Corporations ☞432(5)—Plaintiff, relying on corporation's agreement to permit plaintiff to use private roadway, had burden of proving agreement authorized by directors.

Plaintiff, claiming that defendant corporation had agreed to permit it to use roadway in which corporation had exclusive right of way, had burden of showing such agreement to have been authorized by defendant's board of directors.

15. Frauds, statute of ☞60(1)—Agreement granting right to use private roadway held within statute.

Agreement by owner of land granting to another the right to use private roadway was agreement for an interest in land, a perpetual easement, and was void because not in writing, under Vernon's Sayles' Ann. Civ. St. 1914, art. 1103.

16. Frauds, statute of ☞144—Rule stated as to when contract within statute enforceable because of reliance thereon.

In order that parol contract entered into in violation of the statute may be taken out of the statute and contract held enforceable, it must appear that the party insisting on the contract has thereby been induced to act to his detriment, and that he will suffer loss if the contract is not enforced.

17. Frauds, statute of ☞144—Parol agreement giving right to use private roadways held not enforceable on theory of estoppel.

Parol agreement granting right to use private roadway, void under Vernon's Sayles' Ann. Civ. St. 1914, art. 1103, held not enforceable on theory that owner of exclusive right had received benefits of agreement, and was estopped from invoking statute in absence of evidence that other party had acted to its detriment or expended money in reliance on the agreement.

18. Easements ☞54—Owner of dominant estate cannot change character or extent of easement.

Owner of dominant estate cannot change or alter the character or extent of the easement, or subject the servient tenement to additional burden.

19. Boundaries ☞40(1)—Evidence held insufficient for submission to jury as to encroachment by defendant on plaintiff's land in construction of fence.

Evidence held insufficient for submission to jury as to whether defendant in construction of fence had encroached a portion of a foot on plaintiff's land.

On Motion for Rehearing.

20. Frauds, statute of ☞150(3)—Petition disclosing on face that cause of action within statute subject to general demurrer.

Petition disclosing on its face that cause of action is within the statute of frauds is subject to general demurrer.

Appeal from District Court, Jefferson County; E. A. McDowell, Judge.

Suit by the Ladies' Benevolent Society of Beaumont, against the Magnolia Cemetery Company. Judgment of nonsuit, and plaintiff appeals. Affirmed.

Gordon, Lawhon, Davidson & Pool, of Beaumont, for appellant.

Orgain & Carroll, of Beaumont, for appellee.

O'QUINN, J. The following statement of the nature and result of the suit, which appellee admits to be substantially correct, is taken from the brief of appellant:

"This suit was instituted by appellant, as plaintiff below, against appellee, as defendant below, on October 25, 1921, alleging that it owned 3 acres of land therein mentioned, which was owned and used for cemetery purposes; that appellee owned a tract of land to the south thereof, also used for cemetery purposes; that when appellant acquired this 3 acres, there was a public road or street lying along and adjacent thereto on its south side, and that appellant bought its 3 acres with reference to such road, street or alley, and with the understanding from appellee that it was such, and would be kept open for the public and appellant; that at such time appellee recognized such road or street as such, and had its fence along the south line thereof, and that, until recently, both appellant and appellee recognized the same as being a common passage or highway between their respective properties, and that the rights of each had been recognized therein, but that appellee recently had asserted ownership, and denied appellant the use thereof; that appellant and appellee, after both had acquired title to their respective lands, acting through their officers, had made various agreements respecting such street or road, each recognizing at all times that it belonged to neither of them, but was public, and that by their joint agreement several years ago, this road, street or alley was closed by a gate for the purpose of keeping cattle from entering their burial grounds; that during 1921 appellant and appellee attempted to enter into an agreement which, among other things, dealt with such road, street or alley, and under which negotiations each party was to grant the other certain rights over their lands, and appellee was to shell and gravel such road or street at its own expense, and thereby at such time reaffirmed that such roadway was public, and not owned by either of the parties; that, for the first time, and although such agreement respecting such roadway had existed as stated, when such negotiations were reduced to form, appellee asserted that it owned such road-

way, and that appellant had no rights therein; that since such time (in 1921), appellee wrongfully erected a fence along the north line of such roadway, against and encroaching on appellant's 3-acre cemetery property, and that appellee has laid off into burial lots such road or street, and made a map thereof as a part of the cemetery property of appellee; that such roadway is valuable to appellant, and gives it access to its property, and that such property would be depreciated in value if it is closed and used as burial grounds.

"Appellant alleged that it had no full, complete, and adequate legal remedy, and prayed for injunction against appellee restraining such acts, and to remove the fence from such roadway and from appellant's property. A temporary injunction was ordered in October 25, 1921, bond executed, and writ issued on the same day.

"Appellee answered by general demurrer, general denial, admitted appellant's allegations in paragraphs 1 and 2, and denied that there was a public roadway as alleged by appellant, and denied that it contributed in any way to an understanding that same was a public road or street or would be kept open; it denied recognizing such road or street as such, or that it would be kept open, but says it never recognized the same as such, and that it had always asserted ownership thereto since its purchase of its property in 1887; that such roadway was conveyed to it by its grantor, and that same has not been recognized since as an open public roadway; that it was not an open public roadway prior to appellee's purchase, because it had not been dedicated as such, but was only a private roadway, used with permission of its owners; it denied making any of the agreements alleged by appellant, and said that, if same were made, they were made without its authority; it admits negotiations in 1921 alleged by appellant, but says there was no recognition by it of such public highway or that appellant had any rights therein, but that such negotiations recognized appellee's right to control such highway; that asserting its ownership to such highway, it in 1890 fenced same in connection with its burial grounds and has kept same enclosed ever since, and that since such time neither appellant nor others except itself and users of its cemetery, used or had access to the same; it admits the placing of the fence in 1921 along the north line of such roadway, and the platting of same into burial lots, but denies that the fence encroaches onto appellant's property. It pleaded the 3, 5, and 10-year statutes of limitation to the roadway.

"Appellant replied by supplemental petition, by general demurrer, general denial, and specially denying acquisition of title by appellee by deed, but that it acquired thereby only an easement over such roadway, in connection with others similarly situated; that it is true as alleged by appellee that such road or street was in use long prior to the deed to appellee, and no exclusive claim was ever asserted thereto by appellee until shortly before this suit was filed; that the agreement concerning such roadway alleged in paragraph 5 of its petition was made with respective presidents, who acted with authority, and that appellee's president was also its general manager and acting within his powers as such; that, if

mistaken as to express authority, appellee's president and general manager acted within his implied official powers, and within the general scope thereof; that at that time the fence along the south line of the roadway belonging to appellee was old, and cattle and hogs were going through; that in order to avoid the necessity and expense to appellee of erecting and maintaining a fence along the south line of such roadway, it sought from appellant, and at its special request appellant agreed, to the elimination of the fence along the south line of such roadway, and that instead thereof appellee would construct a new fence along its front or west line, and place a gate across the roadway, and that appellant, although it did not then need it, would and did erect along its front or west line, at appellee's request, a fence similar to that of appellee's, such agreements being that the roadway was for the use and joint benefit of each party as it had previously been used; that in order to induce appellant to erect a fence along such front line similar in architecture and design to appellee's fence so to be erected, appellee would furnish and construct such gate and thus avoid maintaining fences by each party along the sides of such roadway; that such agreements were carried out, and continued with full knowledge of both parties, and has been acquiesced in until a short time before this suit was filed, and appellee has accepted all such benefits, and been relieved of maintaining such fence, and is estopped to deny the authority of its president and general manager to make such agreement.

"That when appellant purchased its 3 acres on April 28, 1896, it employed a surveyor to select and survey same, which was done; that such surveyor consulted with the officers and agents of appellee with reference to appellee's boundaries and was advised by them that a roadway existed just north of its cemetery land, and if appellant acquired land adjoining on the north to such roadway, that the survey should be made with reference to such roadway, and it should be recognized and remain an open road; that appellant thereafter purchased such 3 acres in accordance with such representations as to such roadway and with special reference thereto, and that thereby appellee is estopped to deny the existence of such roadway.

"That such roadway was for a long time used by the public before the deed to appellee, maintained for the public, and in the deed to appellee the grantor intended to create a method of ingress and egress for appellee and others, and that the same was so understood by the appellee and those organizing and acting for it, and was never intended or understood to be for the exclusive benefit of appellee or to convey to it a fee-simple title. Appellee replied by general exception and general denial."

The case was tried before the court with the aid of a jury, but, at the conclusion of the evidence, at the request of appellee, the court instructed the jury to return a verdict for appellee, which was done, and judgment rendered that appellant take nothing by its suit, and denying the injunction prayed for, from which judgment it has appealed.

This is a contest between appellant and appellee as to the use of a 30-foot strip of land situated between the cemetery grounds of the parties. Appellant and appellee are corporations domiciled at Beaumont, Tex., incorporated under the laws of the state of Texas for cemetery purposes. Wm. McFaddin is the common source of title to the land owned by the Magnolia Cemetery Company, and to the land owned by the Ladies' Benevolent Society.

On the 3d day of September, 1887, Wm. McFaddin was the owner of a tract of land containing some 200 acres, situated near to and north of the city of Beaumont. On that date he sold to appellee, the Magnolia Cemetery Company, 13 acres out of said tract, describing same by metes and bounds, and at the close of the field notes describing said 13 acres appears this clause:

"Also a roadway 30 feet wide commencing 30 feet east from the place of beginning of said tract. Thence in a line 30 feet from and parallel west (with) the first line of said tract to a point 30 feet past the second or northeast corner of said tract; thence in a line 30 feet from and parallel with the second line of said tract to the Beaumont and Colliers Ferry road."

The habendum clause in the deed is: "To have and to hold the above described premises together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Magnolia Cemetery Company, its successors and assigns forever," followed by a special warranty clause against all persons whomsoever claiming the same or any part thereof by, through or under him, the said Wm. McFaddin.

On April 29, 1889, Wm. McFaddin sold all the remainder of his interest in said tract of land, 177 acres, to W. A. Fletcher, describing same by metes and bounds, and not calling for or making any mention of the 30-foot strip or roadway granted in the deed to the Magnolia Cemetery Company, and no part of same being included in the deed to Fletcher.

June 24, 1890, Fletcher sold the entire 177 acres to the Beaumont Improvement Company, conveying by the same metes and bounds as contained in his deed from McFaddin, no mention being made of the 30-foot strip of roadway conveyed by McFaddin to appellee. On April 28, 1896, the Beaumont Improvement Company sold to the Ladies' Benevolent Society, appellant, 3 acres out of said 177-acre tract, describing same as follows:

"Beginning at an iron stake on the east side of the Beaumont and Colliers Ferry public road. it being the N. W. corner of a 30-foot street lying and being north of the Magnolia Cemetery. Thence east on the north boundary line of said street 1,008 feet to a point which is in a line with the east line of the Magnolia Cemetery. Thence, N. 10 W. 131, 94 feet to stake for corner. Thence west 1048.8 feet to stake for corner on the east side of the Beaumont and Colliers ferry road. Thence, S. 26 E. along the east side of the above-mentioned public road, 143.7 feet to the place of beginning, containing 3 acres of land."

In 1890, appellee placed a wire fence around its 13 acres. The evidence for appellee shows that the 30-foot strip in controversy was included within the inclosure; that is, that the north line of its fence was on the north line of the 30-foot strip, but the evidence of appellant controverts this, and shows that when appellee fenced the 13 acres it placed its north line of fence on the south side of the 30-foot strip, and that, when appellant fenced its 3 acres, it placed its south line of fence on the north line of the 30-foot strip, leaving a road or opening between the fences 30 feet wide.

Appellant's first six propositions assert that the court erred in peremptorily instructing a verdict for appellee, because the evidence raised the issues: (1) That Wm. McFaddin, at and before the date of his deed to appellee, dedicated the strip of land to the public, as a road or street; (2) that appellee, after acquiring the property rights set forth in the deed to it from McFaddin, dedicated a street or roadway over the property in controversy, thereby giving appellant the right to keep same open for its use; (3) that the evidence adduced upon the trial showed that the roadway or street in controversy had been used by the public for many years with the permission and knowledge of McFaddin prior to the deed to appellee, and with the permission of appellee for many years after that date, and had been treated by them as an open, public road; (4) that the strip of land or roadway had been dedicated to the public as a road or street by the joint and continued acts of Wm. McFaddin and appellee; (5) that the strip of land had been used as a street or roadway by the public for more than 10 years under Wm. McFaddin and appellee, and for sufficient time to mature prescriptive right thereto in the public, which prescriptive right inured to appellant's benefit; and (6) that the roadway or street in controversy was being used as such at the time that appellant purchased its 3 acres, and that appellee represented to appellant that such street or roadway was to be kept open and maintained as such, and that appellant must respect same, and that appellant purchased its three acres with reference to such street or roadway and with the understanding, based upon appellee's representations, that such street or roadway would be kept open.

In its brief appellant presents the above propositions grouped. Summed up, these propositions present two contentions: (1) That McFaddin and appellee dedicated the strip of land or roadway (frequently referred to by appellant as a "street") to the use of the public; and (2) that a prescriptive

right or title to said roadway was shown to be in the public. We shall consider them together.

[1] The rule is well established that the burden of proof is upon the party claiming an easement in the land of another, without any contract or express grant thereto, to establish all of the necessary facts upon which the right may be presumed in his favor, and a failure to make proof of any such facts is fatal to the right asserted.

Mrs. Bohrer, witness for plaintiff, testified:

"* * * To my knowledge there was always a street between the north line of the Magnolia Cemetery and the south line of the 3-acre tract the Ladies' Benevolent Society purchased; always. My knowledge of the existence of a street between those two tracts of land runs back ever since the Magnolia Company put up the fence. There was a street there before, and then they put a fence there, and there was a street running right along the side of it. I base my statement that there was a street there on the fact that everybody used that; went on down toward the gully in the back; and I have noticed wagons on it time and again, and wagons, wood wagons, passed there going to the back there to get firewood and things like that from off the bayou back there, and hauling it out. The Magnolia Cemetery Company had its fence commencing right on the road and running back as far as it went to the bayou on the north side of the 13 acres. Their fence was on the south side of the street. The road was always open. The fence did not inclose the road. It was right on the edge of its line, or was supposed to be. It did not inclose the road. * * * I remember when the land was purchased; I think we fenced our part about 6 months after we bought it. The Ladies' Benevolent Society constructed its south fence right on its line opposite the 30-foot road from the Magnolia Cemetery. In other words, the Ladies' Benevolent Society made their fence right along the north line of this 30-foot road. At that time the fence of the Magnolia was along the south line of this road. This 30-foot road or street at that time looked just like a rough country roadway; just could see it was used; like any other road; it had brush on it, and wagon tracks, and things like that.

"That takes us up to about the year 1896, when the Beaumont Improvement Company sold to the Ladies' Benevolent. There never was any change in this 30-foot road until we put up the iron fence. The roadway was always there and open, and when the Magnolia Cemetery thought of putting their iron fence, they came to us and said, 'Why not let us all put an iron fence along there, and make it look nice?' Later on an iron gateway was put up closing up this 30-foot road. There was no cattle law then, and cattle were always breaking the fences down, and our fence, of course, being much newer than the other, it didn't damage ours as much, but the other was mostly all practically down, so Mr. Wiess came to my mother and says, 'Mrs. Loeb, we will put up a gate there at our cost; it will cost you nothing, and we will use the roadway jointly, and it will save this long fence on each of our lines,' so mother says, 'Our fence is pretty good yet.' He says, 'Yes, but in time it will rot, the same as ours have, and we might as well now, while we are putting up the iron fence, put up the gate; put two posts and the gateway, with no cost to the Ladies' Benevolent,' because we haven't any. We are a charitable organization, and use most of our money for charity, and he says, 'There will be no cost to you whatever, and we can use it jointly.' So my mother said she thought that was a very nice proposition, and let Mr. Wiess do that. With reference to the fence along the Collier's Ferry road, he made no other proposal; just said if we would all put up a fence alike, and put the gate there, it would look so much nicer, and we paid for our fence along the frontage, and they paid for the gate. The fence I referred to, as being practically down on the Magnolia Cemetery side, was this fence they had along the south line of the roadway, the side fence, we call it. * * * This fence that my mother stated to Mr. Wiess didn't need repairing on the part of the Jewish people, was the fence along the south line of our 3 acres, and along the north line of the road. * * * Mr. Wiess just simply said it would save both organizations the expense of keeping the long side fence up; that the long fence on the sides were very expensive to keep up, on account of cattle getting in, you know, like that, and he said that putting up this gate and closing the roadway would be a great saving to both, to put the fence up, and that we could use it jointly, just the same as if it was open. At the time this conversation took place, at which I was present, between Mr. V. Wiess and my mother, Mrs. Delphine Loeb, Mr. V. Wiess was president of the Magnolia Cemetery Company. My mother, Mrs. Delphine Loeb, was president of the Ladies' Benevolent. As to what the respective parties did in order to carry out that agreement; well, all it was, Mr. Wiess put up the fence, put up the gate, and we used it once or twice only; that was all, because we didn't need it then. Our cemetery wasn't filled in the front end, so of course we didn't need the back. They carried the agreement out by Mr. Wiess putting up the gate. That was all necessary. That was all he wanted to do, and we agreed to it. Mr. Wiess suggested that the Jewish ladies put up the same kind of fence as to material and design along the west line of their 3 acres, similar to the fence on the west line of the Magnolia 13 acres. He said it would make it look nice, if we all had an iron fence. We had a board fence then, and he said it didn't look nice, and he said if he put the gate there we ought to put the iron fence and make it all look nice, and we did. That was the only reason. We didn't exactly need the fence then, but as we could get it cheaper getting it all together, we put it up. That was what he said. It would be cheaper if we bought it all from one party, and the freight rate would be cheaper by sending it all together, and that we would need a fence in a few years anyway, and we might as well put it there right then, and save that expense of additional freight rate, and the man made us a better price by buying a big lot together. From that time on, down to the time this present controversy arose, none of the offi-

cers of the Magnolia Cemetery Company or Ladies' Benevolent Society ever discussed the matter of whether that was a road or roadway to which the ladies were entitled the same as the Magnolia people. We naturally thought it was, and I don't know as anybody ever spoke about it at all. I never heard any one question the right. It was always considered a road. Nothing was done with the fences after the gate was put up. We let ours stand until it rotted down, and when it rotted down, we didn't build another, and they did the same. Theirs was virtually down; and they let it go to ruin; and they didn't put up another. Neither of us put up a fence after our fences got so they were no good any more.

"I had some negotiations with Mr. Gilbert. I presume he must have been acting in the capacity of president of the Magnolia Cemetery at the time he came to us. The Magnolia Cemetery bought the Penman Iron Works up there on the other side of the Ladies' Benevolent Cemetery, and they wanted a roadway to go from their present cemetery over to the new cemetery, so Mr. Gilbert asked me wouldn't we give him ground across our cemetery free of charge, and they to maintain all roads, keep them graveled, and the dividing fences which were between this roadway across our ground, and would we give it to him. I said, 'Well, I guess we would,' and for that he said he would give us the use of the Magnolia Cemetery driveways to get into the back to where the extent of our ground. I said, 'Why do that; why not just fix up that street that is between us now and use that?' He said, 'Well, all right; we will fix it up,' but he never did. This plat here shows the Magnolia Cemetery 13-acre tract and the Jewish cemetery 3-acre tract, and marked in red across the land of the Jewish cemetery is a tract 25x130 feet. That is what I promised to give Mr. Gilbert across the Jewish Cemetery to get to this tract shown on the plat—W. C. Tyrrell nine and a fraction acres. They wanted to construct a roadway from the 13 acres where the old cemetery was across to the Tyrrell property they recently purchased, and wanted a right of way across the Jewish Cemetery, and I offered to give it to them for nothing. I presumed they were going to keep it up. In discussing this proposition with the Magnolia people, I said to Mr. Gilbert right away 'Why not fix up the roadway instead of going around here and over this way?' He said, 'We will attend to all of that. We will fix it all up.' He never gave me any paper to sign embodying the idea that that roadway now in controversy would be fixed up. He said he was going to put it all in a paper, and state what they would do, and whenever the paper came it never mentioned that at all. When I say 'that,' I mean the roadway. It never mentioned that. It just gave us rights over the driveways and all like that, for the use of that ground there, to use that strip, but it didn't make any mention of the roadway now in controversy, but he always gave me to understand that it would be fixed; that it would be put in the contract, but he never put it in. When the contract was presented to me for the signature of the Ladies' Benevolent Society, I didn't sign it when I noticed the road was not mentioned in it. I did not sign it. One morning Mr. Gilbert rang me and said he had the contract ready for me to sign; please come down and sign it. I said, 'I can't come down,' and in a few minutes a young man came to the house with the contract, and says, 'Please sign this, Mr. Gilbert says, and send it back.' I says, 'I can't sign it now. It has to be signed before a notary.' He says, 'Our notary will take your affidavit over the phone.' I says, 'Some more have got to sign it, and I haven't time to read it. Just leave it, and I will be down after noon to sign it.' When I read it I noticed Mr. Gilbert didn't have any roadway in it. He had all the main driveways of the Magnolia Cemetery. So that evening I went down he said Mr. Gilbert was going away and wanted it fixed before he left, so the next time I saw Mr. Gilbert I said, 'Mr. Gilbert, I couldn't sign that. You haven't the roadway in there that you would shell and keep it up for the use of the ground we are giving you.' He says, 'It must have been a mistake; that will be all right; don't doubt me.' I said, 'I don't doubt you, but it ought to be in there.' And Mr. Gilbert never once denied there was a roadway to me; never. Whenever I mentioned the roadway he kind of was evasive about it, and always told me it was in there. He sent me papers several times, and whenever I would speak to him he said it was in there; and I could never see where it was, and I didn't sign it. During the time I was negotiating with Mr. Gilbert regarding this matter I just testified about, I was the president, and am now, of the Ladies' Benevolent Society. I presumed Mr. Gilbert was president of the Magnolia Cemetery Company. He kept telling me he would have his stenographer put it in, and they didn't, and finally I turned it over to you (Mr. Gordon), and you know what transpired after that. After I turned the matter over to you, I think you had Mr. Gilbert's lawyer to fix up a contract, embodying that idea about the road. Then I signed the contract. I think this is the contract I signed. That is my signature on it. It is the one I signed, and I acknowledged it, as shown here. Mr. Gilbert sent me a contract about 3 times or more to sign, in which this roadway was not mentioned, and in which he stated it was mentioned. He sent me different times copies for me to sign, and said it was in there. The only conversation I had with any of the other officials of the defendant regarding this matter, Mr. V. Wiess' son, Mr. Percy Wiess, I believe his name is, rang me up one day and told me if I would; asked me if I could come to his office. I told him 'No.' He said if I would go to the cemetery sometime and have Mr. Eckles there to explain to me, he knew I would sign the paper, that it would be beneficial to both of us, and he thinks I should sign it if I would understand it. I said, 'Mr. Wiess, I understand it perfectly, and all I want you all to do is put in there you will shell and maintain that roadway,' and he spoke up and said, 'You don't mean for me to give you $3,000, do you?' I said, 'Give me $3,000; no.' He said, 'Well, we are going to use that for plots, and that is what it will bring us.' I said, 'Why neither of us have any right to use that. That was always a roadway.'"

On cross-examination she testified:

"Mr. Gilbert sent me several contracts. The first one was sent to me by some boy or some one, and returned. After I read it over, I

consulted Mr. Gordon, because I first went to Mr. Gilbert, and he insisted it was in there, and I said, 'I can't see it;' and I went over and consulted Mr. Gordon. As to whether the negotiations after that were either between Mr. Gordon and yourself on the one hand, he representing me and you representing Mr. Gilbert, or between you and me, or me and your office, in reference to what I wanted in the contract—only the last paper did we consult you about that. I had had one or two papers before that. They were not all delivered through Mr. Gordon's office. Once Mr. Gilbert phoned me and I went up to the office, and once, I think, it came by mail. I don't exactly remember, but I got another; how, I couldn't exactly say. Mr. Gordon phoned your office and told you what items I wanted in there. I really don't know whether Mr. Gilbert had left for California before that last contract was signed, or not. The last contract I signed, and which had been prepared by your office and sent to me, putting in there what I told you to put in, Mr. Gilbert refused to sign that, and sent it back, and there it stands. As to whether Mr. Gilbert wanted a right of way across my stuff there for nothing, and whether the consideration of his going across there was the giving us an entrance through the Magnolia, he said we were to use all the driveways if we wished, and he was to maintain and keep up the driveway across the ground in the back. He was to shell or gravel the short piece across ours. In consideration of our permitting passageway over there he would do that, and in addition he would give us a right of way through the Magnolia Cemetery grounds. Excuse me, I told Mr. Gilbert right away, 'We can just use this roadway, and all you need do is shell it and keep it up.' As to whether the first contract which went to me provided for an entrance on this roadway, provided they could give him this cross street across our property, and in consideration of that he would give us an entrance through this driveway now in controversy; no, there was no entrance to it. He was to shell it and keep it up. The first contract did not provide he should shell and keep up that part of it. That was just what he promised me. It provided he should shell and keep up across our way. He always mentioned the main driveway when I wanted him to mention the roadway; he would shell and keep the roadway up. I gave those papers he sent me all back to Mr. Gilbert every time. As to whether the first contract did not mention the main driveway at all, but only mentioned an entrance through the north driveway, but did not provide for shelling of the north driveway; provided for shelling across ours and not the north one; and as to whether I raised objection to the first contract to the effect it did not provide for the shelling of this north street, if you mean the street we are now contending about, he never mentioned it at all, one way or another. He just said 'main driveway to Magnolia Cemetery.' He sent me two on three different contracts, three I got, about three, anyway. The first contract was not changed so as to provide for shelling of this road that is now in dispute, as well as the other, and I did not raise the proposition that it was not to come on the north side, but we were to have entrance through the main driveway. As to whether it was returned to you for the purpose of redrafting, and you did redraft it, and sent it to me, providing for an entrance through the main driveway only, and I then objected to it on the ground that I wanted an entrance through both sides, both the north and main driveway. No, you are mistaken. I never wanted any entrance except through that 30-foot strip; is the only one I ever cared anything about. But Mr. Gilbert always harped on the main driveway of the present Magnolia Cemetery. The last one I signed; that was the one providing for an entrance through both ways. I never did care about the main driveway. All I wanted was this street, for him to shell and maintain for the use of the ground that we gave him, and I had no idea they didn't think it was a street until Mr. Wiess rang me up. The copy which you hand me, taken from your files, of a contract, was not submitted to me for my signature. As to whether the one you now hand me was not next submitted to me in an effort to then meet my objection, I know all I ever got from Mr. Gilbert was saying we could use the main driveway and all the driveways of the cemetery leading over to our cemetery, and he never once mentioned the road, and each time I asked him to mention the road, he says, 'Oh, well; that will all be fixed up satisfactory,' but he never did fix it, and never did once intimate he didn't think there was a dividing line between us. I don't know whether or not this matter was submitted to me for signature. I don't remember. As to whether the contract which I read while ago was ever submitted to me for my signature, I never did see nothing about opening a roadway on the north side of the present Magnolia ground that I know of; never. Always he said except the last one that went between you and Mr. Gordon, that I left in Mr. Gordon's hands after I once turned it over to him, and maybe this is the last one, I don't know. If this is the one that was handed to Mr. Gordon, I read this and signed it; if that is the one. I never paid very much attention; when Mr. Gordon told me it was all right, I took his word to it. That is the same with the first ones presented to me; had he told me it was all right; but he always said it was never mentioned in it, and when Mr. Gilbert insisted it was, I took it to Mr. Gordon, and says, 'Mr. Gordon, see if it is mentioned in there, I can't see it.' Mr Gordon said it was never mentioned. Mr. Gilbert said he would have his stenographer fix it up, and Mr. Gordon says, 'I will get Mr. Orgain to fix it up.' Mr. Gilbert was out of town. He says, 'We will have it all fixed up. Mr. Orgain will fix it.' Several papers were presented to me, and not until the last one was it satisfactory to me, and Mr. Gilbert never intimated that he didn't think that was a 30-foot roadway; and whenever I spoke of a roadway he said he would fix it up all right. As to whether he wanted a roadway over ours, and, in consideration of them giving us a roadway, we were to give him a roadway, no, he was to shell it and keep it in repair; the roadway we thought we had. It was ours—as well as Mr. Gilbert's; or rather, the Ladies' Benevolent as well as the Magnolia. I never once thought Mr. Gilbert was going to give us a road. He was just going to shell and keep it up for the use of both of us. The last contract I did sign represented the matter I finally wanted; but it so happened that they didn't meet the ideas of

the Magnolia in reference to it, so I executed it, but they· didn't. All I wanted was that the roadway would be shelled and maintained and kept up; that was all; for the amount of ground that he was getting, Mr. Gilbert. As to whether this contract was submitted to me, and I made the objection at that time that that only provided for a main entrance, and I wanted through both, 'well, you mention in this that you are going to open on the north side of the present old Magnolia Cemetery grounds. He never mentioned anything about that road here, opening or shelling or anything in any of the papers that came to me. The opening part never came up with us. It was just simply the shelling and grading he was to keep up, and we were to use it jointly. The original, of which this was a copy, was never submitted to me. He never did mention that road at all. We always had the road, we thought. The road was ours as well as theirs.

"Getting back to my conception of the situation; my idea is that there was an alleyway or road between our south fence and the north fence of the Magnolia; call it a road or alley; that is, there was a space of ground between the two fences, of course, and that continued up to the time the iron fence was constructed. The Magnolia never had any fence which included the roadway now in litigation here. They had their line this side of what we are calling the roadway now. That is the north side of the Magnolia Cemetery, but the south side of the road; and there was a road between us, an old country road, but it wasn't on the road at all; it was on their property line."

On redirect examination she testified:

"This last contract that was submitted, and which you (I) signed, and which Mr. Gilbert returned to me unsigned, was written by Mr. Gilbert's attorney. Mr. Gordon never suggested anything to be put in the contract. I just simply asked him to tell me if it was all right—if the roadway was mentioned; because Mr. Gilbert always contended the roadway was mentioned, and I said, 'Mr. Gordon, I can't see where the roadway is mentioned at all and Mr. Gilbert contends it is.' He says, 'It is not,' and when I went there, he said, 'Now, this time the roadway is mentioned; it is all right'; but Mr. Gordon never suggested anything any time. I· was the one always asked him questions. The copies which Mr. Orgain submitted to me, in which each one or more of those copies mentions the road, and I objected to it, it was on the theory that there was nothing said in it about shelling or graveling the road. He never mentioned it at all; not any of them; the road, either for shell or gravel, or anything. It was simply not mentioned; always said the main driveway and driveways of the Magnolia Cemetery, but he never mentioned the roadway at all in any of them.· Until the last contract was submitted, which I signed, they did not ever agree to shell or gravel that road; never, never, never. He never did. He always said it was all right, and it would be fixed up all right, but that is all the further it went."

On recross-examination she testified:

"Speaking about the last contract being drawn by you, I remember that you so stated to me that Mr. Gilbert at that time was out of town, and that you would put everything in there I wanted, and try to meet my views, and that you didn't know whether it would meet theirs or not; so in drafting that I did not understand that you were representing the views of the company, except in an effort to get a contract that suited me, and I could submit it to them." ·

Recalled, she testified on redirect examination:

"This gate that was put up under the agreement made between my mother and Mr. V. Wiess was put up around about 1910.· * * * When this fence was put up in 1909 or 1910, this gate, both fences were in a dilapidated condition when we put in the iron front fence, and the Magnolia fence was in a worse condition than ours, because, of course, ours had been made later. * * *

"Up to the time the gate was put in under the agreement, no one in particular was claiming the right to the use of this 30-foot strip in controversy. It just seemed to be a roadway or pathway open there, or a street, between the two places; that was all; just a place open between two fences. Everybody used it; seemed like for public use. There was wagons on it. I have seen wagons going to the bayou and coming back with wood. That was all. That 30-foot opening extended back eastward to the old bayou or marsh or gulley. It seemed to run as far back as the cemetery line ran; to the edge of the gulley there. * * * My knowledge regarding those two fences is positively; absolutely. Our fence was just a board fence, upright; that way, and the Magnolia had either long pieces on their fence with wires between, kind of barbed wires, or something like that, is what the Magnolia had. * * * After the gate was put up and these two fences torn down or destroyed, this gate, when opened, let into the property of both. It was a streetway between both graveyards."

C. B. Daniell, witness for plaintiff, testified:

" * * * I am familiar with a 3-acre tract of land purchased by the Ladies' Benevolent Society from the Beaumont Improvement Company in 1896. Some time in the early spring of 1896, the Jewish Society, or that which was formed by Jewish ladies, known as the Jewish Benevolent Society, as I understood it, the president being Mrs. Delphine Loeb; they employed me to buy a tract of land, out of which they wanted to make a cemetery, and I looked around at several tracts, and ·finally located on what is now known as the Jew's Rest or the Jewish Cemetery,· just off the Magnolia Cemetery. The property then belonged to the Beaumont Improvement Company, and I negotiated with Mr. Guy W. Junker, who was the agent of this property, and we finally agreed upon terms to buy 3 acres of land on the north of a road which was north of the Beaumont cemetery, Magnolia Cemetery, and after we agreed upon the price and everything, we proceeded. I was authorized to make a survey of the 3 acres by the Beaumont Improvement Company, which I did. Previous to that I consulted with Mr. V. Wiess, who was then, as I understood, the president and general manager of the Magnolia Cemetery, and I went to his office, which was down there in the old part of town, and I got a copy; as

well as I remember. I got a copy of the deed of the Magnolia Cemetery, and discussed it with Mr. Wiess. I don't remember if he furnished the copy or whether I came to the courthouse and got a copy, but we had a copy of that anyway, knowing it bounded on the property which was to be surveyed, and I discussed the matter with Mr. Wiess, and we discussed the matter of the road being north of the cemetery, and he stated to me that the deeds clearly set forth that there was a road north of the cemetery, and also to the east of the cemetery, and I must have respect for that road; that I must not trespass on it, that is, take any of the road and put it into the land which the Benevolent Society was buying; I must stay strictly on the north line of the road. He didn't mention whether it was public or private road. The only explanation made to it was a road. That is the way my memory serves me now; and Mr. Wiess instructed me that the fence then inclosing the Magnolia Cemetery was then on the upper line, and the road was to the north of this. I proceeded then, as a surveyor, to go up there and begin at the corner of the fence where he said was the northwest corner of the cemetery land, and run east first on what was known as Collier's Ferry road; some people now call it the Country Club road. I began there and made the survey, running east from that point; commenced there and ran north 30 feet the width of the road. Then I went back to that and measured down the fence, the cemetery fence on the south side of the road, over to the northeast corner of the fence, and there I identified the northeast corner of the cemetery land, and I measured then to the north 30 feet for the width of the road, and established the southeast corner of the 3 acres which was purchased for the Benevolent Society Association. I then proceeded to survey the ground out, and did survey it out; and afterwards the Jewish Cemetery people, Mrs. Loeb and others, I believe Mrs. Levy and Mrs. Ludlow, quite a few of those ladies connected with it, they said they wanted to fence it, and I went up there and began at the southwest corner, as I had established it on the east line of the Collier's Ferry road, and ran to the southeast corner on the line that I had established, and put stakes along there for them to put up a fence, which they did, on the south line of the 3-acre tract, and on the north side of the road. * * * As to whether I was familiar with the existence of that 30-foot roadway between the 3-acre tract and the 13-acre tract, independent of this transaction, I had worked up there for the Magnolia people; had gone in and done a lot of work laying out cemetery lots, and naturally was familiar with the location of everything up there; and then when Mr. Wiess told me to respect that street, I did, sir. There was an open way there north of the fence there. There was an open way, I remember. When surveying I offset a little bit so as to get out of the way of shrubbery and brush and vines that had grown up, the way I established the southwest corner of the 3-acre tract and northeast corner. The shrubbery was so dense you couldn't see straight from one to the other, and I offset and then measured back so as to see how to cut a line, so that I could see straight from one to the other. I am the man who prepared the field notes referred to in this deed from the

Beaumont Improvement Company to the Ladies' Benevolent Society, dated April 28, 1896. I commenced making my description here, beginning at an iron stake on the east side of the Beaumont and Collier's Ferry public road, it being the northwest corner of a 30-foot street lying and being north of the Magnolia Cemetery. I actually surveyed it on the ground. I saw the road there at the time the survey was made. I prepared the field notes, and Mr. Junker had the deed written, and as well as I remember I took the acknowledgment of Mr. Levy. I acknowledged the deed. I was notary public. As to the general direction and continuation of this road north of the cemetery; it ran back from the Collier's Ferry road, ran east over to the swamp end of the cemetery; and also there was a 30-foot strip on the east side of the cemetery, which would cause the road running in the direction from Collier's Ferry running east, when it got to the northeast corner of the cemetery line, it would then turn south to follow out the road as, specified in the deed to the cemetery people from McFaddin. * * *

"There is a foot of a bluff, a high bluff, on the east edge of the Magnolia Cemetery, and there is no roadway leading from it. I have traced it all the way from a space 500 or 600 feet, something like that. To the south of that, there is an old roadway that went right up the east edge of the bluff and west edge of the swamp, Neches river swamp, and it was out in there, and I have been told by people many years ago—when I first come to Texas, 32 years ago—that once was a public road leading from Tevis' Ferry to Collier's Ferry, and later on the present road was laid out, but signs of this old road along here on the east side of the cemetery, where this road exists, where Mr. McFaddin gave land, and since I have been here, has been used by people going into the swamp there getting out cypress timber, and any other timber they could get out and haul it out, and traveled this old road, and it is all the way from the Magnolia Cemetery, or what is known as Sheffield alley down here, up by this, and up onto Collier's Ferry road, all along signs of that old road on that bluff yet, and I have often seen where people went up there and down there in wagons hauling cypress posts and things out of the swamp. In doing that they had to make use of this 30-foot strip shown on the east line of this map, or get down in the swamp. People using this road could come here and turn here (indicating on map), and go out Collier's Ferry road; or come here and go down further south, and come up what is known as Sheffield's alley, which is now the south line of the Magnolia Cemetery. * * * I don't remember ever seeing anybody coming out that way, because they were always down there on the bluff next to the swamp getting out timber. * * * As far as I know now, there was never any road dedicated in there, but it was used by people hauling out timber. * * * This road mentioned in the deed was a direct outlet from this old cemetery up by the east side of the new cemetery or the Magnolia Cemetery up to its northeast corner, and then a direct line westward out to the Collier's Ferry road here, which ran down to the city. That was one place of egress and ingress; where people could pass in and out, going or coming. * * * "

On cross-examination, he testified:

" * * * Mr. Wiess told me, as I told you yesterday, to respect that road, and not encroach upon it, without making any statement to me as to whose it was. He never said that. Here is the way I stated to you yesterday, that Mr. Wiess didn't convey any idea about as to whether it was a public or private road, and who could or could not use it. It was just a road, and asked me not to encroach upon it whatever. * * *,

"The road I testify now about down there on the east, I have reference there to the road that used to go on up to Collier's Ferry before the Collier's Ferry probably was built. I have seen signs of a road along there, and I have heard an old road existed there before the present. As to whether I know that road is under the hill all the way; that is under the hill, too. That (indicating on plat) is on the north side of the cemetery. As to whether there was ever any road on the north side that came out that way at all, except that wagons sometimes hauling wood out of the bottom would come up that hill most anywhere along there, and out. They usually came up below the lower wood; came up the Sheffield alley. As a rule they didn't come up that way at all, they came down Sheffield alley to the south and came out. As to whether when I was talking about a matter of convenience this morning, I was just simply talking about ideas existing in my head what might have been done, when I knew as a rule the traffic came from the woods on down and out by Sheffield alley. The most of it did, yes, sir; but it could have come, if they had wanted to. They could have come anywhere across there, because in the early days that was not fenced, when the Magnolia put the first fence there. I do not know as a matter of fact they used to go across the northeast corner of the Magnolia property before it fenced, because I wasn't there then. I came here in 1891. I don't remember seeing the traces of an old road across there. In surveying the Jewish Cemetery, I know there were roads running cross and forth coming out of the bottom anywhere around there. There was an old trail out to the north of the Jewish Cemetery, just to the north, went around into the woods. There was more trails than roads, winding through the timber and getting the best possible way out. As to whether I drew this as representing that road on the east, and went on and extended that and put a yellow piece of paper and said, 'That road along here, this is a bluff along here, that road comes on out,' and said it didn't run on that angle, it come and run on up here, I said this road here; I put a piece of yellow paper on there. I said the southeast down here was down on the low land, flat land, and this corner up here, northeast corner of the cemetery, was on a bluff; high land; and I said this is high land all the way across over here. I said this road did not run up on this bluff, it stayed down behind the bluff and come on back here, except up here at this corner. I said the road followed the edge of the bluff. That is what I told you. As to whether I said the corner was up on the bluff, but the road was down below, the old Collier's Ferry road was down below, but the road left here by McFaddin—as to whether I am talking about the field notes of

what is called a roadway, and am not talking about the road actually on the ground, I don't know why I wasn't. You say you are talking about the old Collier's Ferry road; that is it. I told you it followed the east end of the bluff, as near as possible, and the west side, that went up on the bluff high enough to keep out of the low land and swamp. Assuming that this strip of land covers the description in the McFaddin deed, now that lies right adjoining the cemetery. The travel on the ground there was just below the fence there. As to whether it was on the outside and didn't get on that 30-foot strip at all; might have been in some places there up towards the east, and I don't know as it did, but down on the lower side it did, I know. It may have crossed it, because it ran on the swamp here, but it ran on, it didn't run right along the edge of the cemetery grounds. It didn't follow right beside the fence, not up here at the northeast corner, but it did down here at the southeast corner.

"If you understood me to say this morning that the roadway actually on the ground traveled up that 30-foot strip, as described in the McFaddin deed, then that wasn't what I intended to say, not all the way up to that bluff. It kind of crossed it down at the southeast corner, and followed up to about midway of the cemetery. It crossed the southeast corner and followed along up that strip there to about the middle of it, and diverged a little to the east, and didn't come to the corner of the cemetery line. It followed more the edge of the swamp than it did upon the bluff. That northeast corner of the cemetery line was up on the bluff. As to whether you asked me yesterday, in talking, whether there was a road up here, and whether I said there never was a road used there; that Collier's Ferry road went on and came back here to the northeast; there never was a road there. I told you I never saw anybody use it, and I never did. When I testified this morning about the convenience of that road coming up here and then coming on out, it could have been done. I don't testify from the fact that I ever saw any evidence of it being used. I never saw any evidence of it being used, but I will state it could have been used, if they wanted to. There was a roadway come off of Collier's Ferry road on the east side, right south of the cemetery, and come, known as the Odd Fellows' road, into the Odd Fellows' Cemetery, but it was never used that I know of. As to whether that road was used until this road was built through the Magnolia Cemetery in the center where they could get over to that; I don't know as that road was open in the cemetery when I came here, but I do know—when I testified that this road was accessible to that, this morning, as to whether I testified from the fact it was actually used for that, or merely from the proposition it could have been used if they wanted to, and it was open, I have seen where people did use that coming down what was known as Sheffield alley, and coming around on the part of the swamp; saw wagon tracks and horses' tracks. I have seen a roadway down Sheffield alley, which is there today, and used today, which extended back into this swamp, on which they hauled timber, and the roadway used to come on here and to the old Collier's Ferry. This pass led to the east cemetery. That road there was part of it.

"As to whether that road I am talking about was east of this roadway, except on the end it kind of crossed it catercornered, it followed that up to near the northeast corner of the cemetery, and that went on the bluff and that stayed under the bluff next to the swamp. As to whether there was any way to come up that road as far as that 30-foot strip came up with a wagon; oh, the land was open. He could if he wanted to, but you would have to get out of the beaten path if you wanted to; you would have had to leave the old roadway that was being used, but there was nothing to keep him from going up there. Of course there wasn't nothing there to prevent him turning to the right and going across, just like an open prairie. There was nothing to keep you from going where you please. That is the idea. That is the reason I say they could have gone up around there. Of course, there wasn't anything to keep them from going. * * * Here is the idea I intended to convey, and which I hope to convey so clearly you understand it. I said that there was an old cemetery down there, part of it known as the Odd Fellows' Cemetery, and south of where the Magnolia Cemetery is now, and with the exception of this Odd Fellows' right of way coming in there, any one who expected to get in there would either have to come up here to where this roadway, which is spoken of in the McFaddin deed to the cemetery, and come down here and get into that, or they would have to come around the Sheffield alley and come around up there. They either had to take one of those routes, or come down this alley way down here, and come up here, and cross that gulley. But it would be much further to come down around across this north alleged roadway, and around there and then back to get there, to the lower part of this down here. It would have been further down there, of course, but it would have been a better way, but at the same time it was a way they didn't use, and never used, so far as I know. I never heard of it being used. As I told you, the first recollection I had was in 1891, and the central driveway in the Magnolia Cemetery was open then, and all the people went in and out to the old cemetery known as the Odd Fellows' Cemetery and the new cemetery. All went through that driveway there. When I was surveying there, I found out and just testified I ascertained this old road was known as the Odd Fellows' road because it was used going to the Odd Fellows' Cemetery before they had this main driveway through the regular cemetery. Therefore, I never heard this roadway being used to get down there, but I did hear this was an old road went in there, and which they continued to use up to the time they had this main driveway. I stated this morning I never heard of them using this route or thinking about using it. * * * Now, since I have been in Texas, this central driveway through the Magnolia Cemetery has always been used by everybody that I have known to go either to the Odd Fellows' Cemetery or to the Magnolia Cemetery; and it is still being used to go down to this new addition which they have bought to the south of there, which is known as the Gill property, the Daniel Gill property; and it now goes down to the Sheffield alley there; and they still use this central driveway to come into the cemetery; and after this was opened up, as far as I know, from the time I

have been in Texas, since 1891, this had always been the entrance; this central driveway in the Magnolia Cemetery has always been the entrance into the Magnolia Cemetery, and Odd Fellows' Cemetery. * * * I told you Mr. Wiess told me to be sure and respect that road, and not encroach upon it. I have no recollection of his telling me his corners were on the upper side of that road. I will say this much; he told me to respect that road, which I did. I didn't encroach upon the road. I remember distinctly talking to Mr. Wiess. I went to his office and talked to him concerning it, and he told me there was a roadway to the north of the cemetery, and to respect that roadway; whatever I did, to be sure and respect that roadway; said he didn't want any controversy to arise. That is my recollection of just what he told me and just what I did. * * * The gist of the conversation I had with Mr. Wiess, and which I stated to you yesterday, was to respect that road and not to trespass upon it; not to go upon it; that is, the road was there to the north of the cemetery, and as I was going to lay out a cemetery to the north on the 3-acre tract there, he wanted me to confine myself to the north line of that road. That is the gist of that conversation; stay off that road. He gave me to understand that. As to whether I got the idea from Mr. Wiess that that roadway was open to me or anybody else; that wasn't discussed. That feature of it wasn't discussed. I didn't form any idea. I know what the road is and everybody else knows there is a road. I didn't consider the question of whether or not I would have the use of that road, or anything else; whether it was private or public. I didn't consider that question at all. I didn't consider the question whether it was his road, or whose road. That phase of it wasn't discussed, because everybody knows what a road is, and he didn't state whether it was a public road or a private road, and I didn't ask. All he stated was stay off that road, which I did."

H. A. Perlstein, witness for plaintiff, testified:

" * * * The best of my recollection, there was a kind of a roadway between the 3-acre tract and the 13-acre tract, dividing them. * * * There was a fence on the south of the Jewish Cemetery. There was a fence on the Magnolia about—I don't know the distance—from here across the room. That fence was on the south side. Ours was on the north side. * * * There was an opening between these two fences. I don't know as I can say exactly how wide it was, but there was an opening enough to drive in. That opening between those two fences was an opening on Collier's Ferry road. I don't know whether it was graded or not. It was just an opening there, like a street or alley, whatever you may call it. That opening extended as far back as I could see. * * *

"When that opening was closed, as to my connection with it; well, the Ladies' Benevolent Society come to me and asked me to assist them in letting a contract for the fence; an iron fence to be placed on the west side of their land; and when they did that, they said the Magnolia people were going to build the same kind of a fence, and wanted me to help them close the contract for the cement work and the

iron work and attend to that. I superintended placing the piers, and also the painting of the fence after it was finished; that is, for the Jewish side. When that work was done, I think there was a gate put there in the opening between these two fences—an iron gate. The fence of the Magnolia Cemetery along their west line and that of the Jewish people's 3 acres· along their west line, all the way, clean across, was the same design, made of iron pickets that I helped them pick out, and the gate was the same design. The reason it was all the same design, I think there was something regarding the cost of it,. on account it was the same people, and I think there was something about getting it together on the same contract, in order to assist them. I think it was all let together to the same man; same man built the two sides. I don't know why that was done, except probably for the price or something. It is now several years ago. I can't recall the little details. I have a recollection the price figured in it somewhere. I think they got it· cheaper on account of the freight. There was about 200 or 300 feet of fence, and it was quite an item. With reference to the Jewish fence along the south line of the Jewish Cemetery's 3 acres being the north line of this road, I testified about, I think there was a gate, outlet, maintained in that fence before this iron gate was put in, by which the Jewish people could go ·through that gate through this road to the Collier's Ferry road, and back from the Collier's Ferry road through the Jewish Cemetery, in the south fence. There was a gate in the south fence of the Jewish Cemetery leading to and from this road between the two fences. I don't know what that gate was utilized for; get in, and get out, I reckon. Get in and out of the cemetery. You would get in and out of the cemetery by using that gate; by going through that street, what you call it—lane—between the Magnolia and Jewish Cemeteries."

On cross-examination he testified:

"In reference to the construction of that iron fence, I recall that the Magnolia Cemetery determined to put an iron fence along the front of it, facing Collier's Ferry road, and they proposed to us or to the Jewish Cemetery, or the Jews proposed to them, that it would look well to have the same character of fence in front of them both, and that if they both constructed the fence at the same time, giving the contract to 'the same people, and letting the fence come forward in the same car, it would be more economical to all. I believe that was the understanding. That was the reason, as I understand it, why that was done. The Jewish people wanted a new fence, too, and the Magnolia people wanted a new fence. The Magnolia was standing their part up to this corner, and we were to stand the expense on further. That was my understanding at the time. * * * The opening I speak of in our south fence was an ordinary gate, passage way, for foot passengers. It was an ordinary gate; not a large gate for vehicles to pass, I don't think. As a matter of fact, my recollection is rather hazy about the situation— 23 years ago. My best recollection was there was some character of two fences there, and there was some distance between them. That

is my best recollection. * * * Eliminate the character of fence, and my recollection is definite there were two fences, one on the north and one on the south, and there was an open passageway between them. I don't think the passageway through there was improved, except there was an opening there. I don't know whether there was a road running anywhere. I don't know where it was running to, I couldn't say that. It evidently had been used there. I say that because it was there, I suppose, for the purpose of being used. I can't say what it was. I know it was there is all I know, and can tell you. I know it was there. All I can say there was an opening there. That is as far definitely as I undertake to go. I am giving you exactly the best I can testify. The iron fence has been put up there something like 10 or 12 years, I think, if not more. There is a gate there next to the Jewish Cemetery, which opens almost next to that Jewish fence. It 'opens into that place where there used to be an opening. There is a gate there now that leads into that place where the opening was."

On redirect examination he testified:

"* * * Before the Magnolia recently put up that great high wire fence with arms extended over it, by which this open space was inclosed and made a part of the Magnolia; before they did that, if that gate now there had been opened, it would have led as much into the Jewish Cemetery as into the Magnolia."

W. P. H. McFaddin, witness for plaintiff, testified:

"My name is W. P. H. McFaddin. I am the son of William McFaddin, who executed the deed to the Magnolia Cemetery Company, conveying 13 acres in the Drake. * * * I am familiar with the deed executed by my father on August 3, 1876, to the white citizens of Beaumont, wherein he conveyed certain land for cemetery purposes. That deed was executed about ten years before he executed the deed to the Magnolia Company.. He gave the 3 acres to the white citizens of Beaumont, those 3 acres of ground, for a cemetery.

"The location of this 3 acres which· my father deeded to the white citizens for burial purposes, with reference to the 13 acres of land conveyed to the Magnolia Cemetery association; there was a point of land that bordered down into the swamp, followed the swamp on the east, and a gulley, what we call a gulley, a ravine, ran on the south and west, and it was in the forks of this gulley, and where it joins the swamp just north of the gulley, and below what is now the Magnolia Cemetery Company. * * * Ever since the execution of that deed by my father back in 1876 that 3-acre tract of land has been actually used for burial purposes. ·The piece my father kept for a private burial ·ground for his homefolks, didn't reach the south line of the new Magnolia Cemetery, for the reason that I think the Caswells and Ogdens and somebody else came in there; but there was a reservation made by my father of a tract of land, between the Magnolia 13 acres and the 3 acres he conveyed to the white citizens, for himself. After my father conveyed the 13 acres to the Magnolia people; as to what outlet there was to that private burial ground that he had reserv-

ed to himself, unless use was made of this 30-foot street or road that was reserved in the deed from my father to the Magnolia Cemetery Association; if the Magnolia Cemetery Association had been inclined not to permit him to use the 13-acre tract; well, there was a road going from the Odd Fellows in on the west side, to the Odd Fellows' tract, which was north of the 3-acre tract. * * * You could get out on the south, and you could go out on the Odd Fellows' road, and you could have come out, if they would have permitted you to have gone through the cemetery, but outside of that they would have had to have gone east into the swamp, and that they couldn't do. * * * To get out of that old cemetery that my father conveyed to the white citizens, or out of any of those private strips that were reserved, including my father's strip, unless an outlet had been provided along the north line of the 13-acre tract and the east line of the 13-acre tract, they could have gone south, as you say, and crossed the gulley, and come out to the road. They could have come on the Odd Fellows' reservation, and gotten out to the road, and then they would have to have gone. If this 13 acres had been fenced up, they would have had to either gone through the 13 acres that was sold to the new Cemetery Company, as we call it, or gone east of the 13 acres along the swamp. * * * As to the ways of ingress and egress back to the main highway from this old cemetery and these private burial grounds, as to which would be the most convenient way, including in my consideration the 30-foot strip referred to in the deed from my father to the Magnolia Cemetery Company; according to the way the land is surveyed out, and the corners established today that we have looked at; this roadway is in the swamp on the east edge up to the northeast corner. The 30-foot roadway on the north leads from this street in the bottom of the swamp there out to the public road. It is a direct route from the swamp, where it turns west, to what is known as the old Collier's Ferry road; what is now commonly known at the Collier's Ferry road or Country Club road. It is the Collier's Ferry road."

On cross-examination he testified:

"I have been on the board constantly since we bought the property in 1887 to this day. I know the land that is now included within the inclosure at this present time. The cemetery association has always claimed to own all the land within their present inclosure. That land was first fenced a very short time after we bought it. Getting back to these roads; there was a roadway known as the Odd Fellows' roadway that you could have entered into the property of this old private cemetery grounds. You could also go down over there where Sheffield used to live; I don't know whether it is Sheffield alley or not; and cross the gulley and come in. Either route would have been nearer than the roundabout way which is suggested. There was an old road east of the Magnolia Cemetery property, sort of a trail there, before he ever deeded the 3 acres to the white citizens of Beaumont, and they fenced it up. In 1887, at the time this conveyance was made, there was no road or trail along this 30-foot strip that is referred to. The 3-acre cemetery below there had been fenced there right along the edge of the swamp, clear down to the gulley, and on the

north side, and my father's tract was fenced with this other tract; that is, joining it. The gate went into my father's tract first, and then went into the— There never was a road that was used by anybody along the 30-foot strip running from Collier's ferry back along the north line of the Magnolia Cemetery, as described in the field notes, and can't be used because it is under the hill and in the swamp. The 30-foot strip to the north of the Magnolia field notes, between the Jewish Cemetery and the Magnolia Cemetery, as described in the field notes, has never actually been used for a road by anybody, and I have been up there as much as anybody else. That is now under fence by the Magnolia. The first fence was built soon after we got it; plank fence; but we put this iron fence there about 1910 or 1911, 1909, 1910 or 1911; iron fence. We bought the property in 1887. It was fenced soon after. That fence inclosed within the cemetery grounds the 30-foot strip of land. It has been constantly inclosed since that time. * * * The north line fence is right where it was now. It has been there from the time we first constructed it. That fence is on the line of the Jewish Cemetery, supposed to be. If there have been ever two fences up there, one on the south side of the Jewish Cemetery, and about 30 feet south of that another fence, across the cemetery grounds of the Magnolia, it has slipped my memory entirely, and I don't think it has. If there was ever two fences there, I don't know it. I was familiar with conditions out there. I don't know that the question of whether the cemetery association claimed this 30-foot strip now in litigation up to the Jewish Cemetery line, as their own property ever came up or was discussed. We never dreamed of anybody— We put our fence up there, and was claiming everything on the inside, as well as we knew how, but there was no controversy until this matter came up. Neither I nor any other director, as far as I ever heard him state, ever recognized that anybody other than the Magnolia Cemetery ever had any right to use this 30-foot strip of land. Never heard of it before this suit. In dealing with the affairs of the association and reporting to the board of directors what was being done, and what wasn't being done, Mr. Wiess was a very particular, painstaking, precise man, and never did anything without consulting the ones he was interested with. It is my recollection he was always particular to see whether or not the minutes included everything that was done in reference to it. He has always been that way, not only that matter but all others."

Guy W. Junker, witness for plaintiff, testified:

"* * * I know where the Magnolia Cemetery is; I know where the Jewish Cemetery is just north of it. * * * The Magnolia was in 1887, I think, or 1888, when they organized that. I don't remember. I have been more or less familiar with it ever since that time. The first of my recollection, it seems to me—it is so vague; it has been so long ago—that originally the Magnolia Cemetery had a wire fence between them and the Jewish Cemetery, a barbed wire fence on three sides; that was the front and the north and south side lines, back to the swamp. I mean on the south, west, and north. The fence ran back to the swamp to the best of my recollection. Later on, the Jewish

people bought some property in there from the Beaumont Improvement Company, and they built a wooden fence down part of the way; just how far I don't know; and back of that they had a wire fence. There was a space of 25 or 30 feet there between those two fences. That is my recollection of it."

On cross-examination he testified:

" * * * I was secretary of the Beaumont Improvement Company. The Beaumont Improvement Company never claimed the road. I think their deed came back from their line, from the cemetery line, probably. As far as the Beaumont Improvement; I don't know that they ever did claim any rights in this so-called 30-foot roadway on the north, nor the 30-foot roadway on the east. We didn't recognize that as being the property of the Magnolia Cemetery. We didn't pay any attention to it. We weren't using the road. I don't know that anybody used it. * * * I don't undertake to say that this alleged 30-foot space was not in the Magnolia inclosure when they put their fence there in 1891. I don't know anything about the lines. I don't know anything about the line. They afterwards tore down the wire fence and built a fence along the road, and, I think, joined the two cemeteries, and left a gate in there; the space I speak of. I don't remember when that was done. I couldn't give the date. I state that there was a space of 30-foot road in between the two fences, to the best of my recollection. That is the way I remember it. It has been a long time. Really I didn't pay very much attention to the situation. You see there was a wilderness in those days. There was no road there. There was only one road and that was the road to Collier's Ferry."

The statement of facts is voluminous, consisting of 217 typewritten pages of testimony, various documents, and several maps, but we believe the above is practically all of the evidence offered by appellant bearing upon the issues of right of way by dedication or by prescription. The court determined as a matter of law that the evidence did not raise the issues contended for by appellant, and hence directed a verdict against appellant.

[2, 3] In determining the propriety of directing a verdict for the defendant, the rule is well established that the evidence must be considered most favorably to plaintiff, disregarding the conflicts and contradictions, no matter how strong or how much in conflict the contradicting evidence may be. A trial court is not authorized to direct a verdict for the defendant, unless the evidence is of such a character that as a matter of law no other verdict can be rendered. Choate v. Railway Co., 90 Tex. 88, 36 S. W. 247, 37 S. W. 319; Harpold v. Moss, 101 Tex. 542, 109 S. W. 928; Walker v. Railway Co., 51 Tex. Civ. App. 391, 112 S. W. 430; Price v. Yellow Pine Paper Mill Co. (Tex. Civ. App.) 240 S. W. 588; Guedry v. Jordan, 266 S. W. 191.

As was said by Chief Justice Hightower in Guedry v. Jordan, supra:

"In other words, the rule is, as we understand it, that the trial court can never properly instruct a verdict for the defendant on a fact issue where the plaintiff's evidence on that issue is legally sufficient to sustain a jury's finding in his favor, * * * all evidence introduced by the adversary must be disregarded."

[4] *Dedication.*—Did William McFaddin, at any time before the date of his deed to the Magnolia Cemetery Company, appellee, or at said date, by said deed, dedicate the strip of land in controversy to the use of the public as a road or street? The intent of the owner to dedicate land for the purpose of a highway, road or street must be shown by his acts and declarations, and such acts and declarations must clearly and unmistakably show that he intended to dedicate the land absolutely and irrevocably to the use of the public, and that the public has acted upon the faith of such acts and declarations. Oswald v. Grenet, 22 Tex. 99; Ramthun v. Halfman, 58 Tex. 553; City of Atlanta v. Texas & P. Ry. Co., 56 Tex. Civ. App. 226, 120 S. W. 923; Cockrell v. City of Dallas (Tex. Civ. App.) 111 S. W. 978; City of Pearsall v. Crawford (Tex. Civ. App.) 213 S. W. 328; Elliott on Roads and Streets (3d Ed.) § 138. There is no act or declaration of William McFaddin shown evidencing an intention to dedicate the land to public use, unless it be the clause in the deed to the Magnolia Cemetery Company, conveying to it a roadway on the north and east of the 13 acres he conveyed to it, which we will discuss later. The evidence shows that the whole of the tract owned by McFaddin was open, unclosed land, and that what is claimed by appellant to have been an old roadway on the north of the Magnolia Cemetery Company's 13 acres, and which it says was the roadway embraced within the 30-foot strip in controversy, was used, in the main, by persons who were hauling wood out of the swamp. In fact, this roadway, if it could be termed such, was used so little that, in the language of Mrs. Bohrer, "this 30-foot road or street at that time looked just like a rough country roadway; just could see it was used like any other road; it had brush on it and wagon tracks and things like that." Daniell, who represented appellant in the purchase of its land, and who surveyed same, and who was personally familiar with both tracts of land and the vicinity surrounding same for many years, testified that he did not remember ever seeing anybody coming out that way, and that as far as he knew there never was any road dedicated there, but that it was used by people hauling timber from the nearby swamp. He said:

"If you understood me to say this morning that the roadway actually on the ground traveled up that 30-foot strip, as described in the McFaddin deed, then that wasn't what I intended to say; not all the way up to that bluff. As to whether you asked me yesterday when

talking whether there was a road up there, and whether I said there never was a road used there; that Collier's Ferry road went on and came back here to the northeast; there never was a road there. I told you I never saw anybody use it, and I never did. When I testified this morning about the convenience of that road coming up here and then coming on out, it could have been done. I don't testify from the fact that I ever saw any evidence of it being used. I never saw any evidence of it being used, but I will state it could have been used if they wanted to."

[5, 6] A dedication of land to public use will not be declared by the court unless an intention to dedicate upon the part of the owner is plainly manifest. An owner of land may dedicate it to the use of the public for a highway, but an intention on his part to do so is absolutely necessary, and unless such intention is clearly proven by the facts and circumstances, no dedication exists. If it be conceded that this old road passing through open and uninclosed land had long been used by persons in passing from the Collier's Ferry road back into the swampy regions for the purpose of hauling wood, or by the public generally, in traveling over said land; still, no specific claim or right in the public to so use it is shown. All that the evidence shows, we think, is a mere permissive use by the public of the roadway, and no purpose or intention on the part of William .McFaddin that it should be dedicated to the use of the public. The mere permissive use of a way, or the mere acquiescence of the owner of uninclosed land in the use by the public of a road or way over it is not sufficient evidence, and does not constitute a dedication to the public. Bryson v. Abney (Tex. Civ. App.) 171 S. W. 508 (writ refused); Cockrell v. City of Dallas (Tex. Civ. App.) 111 S. W. 977; DeGeorge v. Goosby, 33 Tex. Civ. App. 187, 76 S. W. 66 (writ refused); Cunningham v. San Saba County, 1 Tex. Civ. App. 480, 20 S. W. 941; Elliott on Roads and Streets (3d Ed.) § 138.

*Prescription.*—Was there such use of the land by the public, before and up to the date of the deed of McFaddin to the Magnolia Cemetery Company, as to give the public the right to use said strip of land as a roadway by prescription?

[7, 8] To establish a right of way by prescription, it must be shown that the public exercised an uninterrupted adverse use of the land such as was reasonably calculated to put the owner upon notice that the public was using the land under a claim of right for a period of 10 or more years, and that such use was not by license or permission. Cockrell v. City of Dallas (Tex. Civ. App.) 111 S. W. 978; West v. City of Houston (Tex. Civ. App.) 163 S. W. 680; 14 Cyc, pp. 1148–1151. In other words, as a general rule, before a highway can be established by prescription, it must appear that the general public, under a claim of right, and not by mere per-

mission of the owner, used some defined way without interruption or substantial change for a period of ten or more years. Elliott on Roads and Streets (3d Ed.) vol. 1, § 194; Jones on Easements, § 164; Railway Company v. Wilson, 85 Tex. 516, 22 S. W. 578. There is nothing in the record to show that the public under an adverse claim of right was using the land as a roadway, but to the contrary, that the use was a merely permissive one. Where the use is merely permissive and not adverse, there is no basis on which a claim of a right of way by prescription can rest. West v. City of Houston (Tex. Civ. App.) 163 S. W. 679; Cockrell v. City of Dallas (Tex. Civ. App.) 111 S. W. 977. Furthermore, for this reason, it has been held that the use of open, uninclosed land by the public in passing and repassing over same at their pleasure for 20 or more years will not give them any prescriptive rights. Cunningham v. San Saba County, 1 Tex. Civ. App. 480, 20 S. W. 941; DeGeorge v. Goosby, 33 Tex. Civ. App. 187, 76 S. W. 66 (writ denied); Railway Co. v. Montgomery, 85 Tex. 67, 19 S. W. 1015.

In Railway Co. v. Montgomery, supra, Judge Gaines says:

"The road under consideration was neither recognized by the commissioners' court nor maintained by the county; nor in our opinion does the evidence show a dedication by the owners to the use of the public. There was testimony to the effect that the road had been traveled by the public for 20 years; but that naked circumstance is not sufficient to show a dedication in a country where everyone feels himself at liberty to pass at will over all uninclosed lands."

In DeGeorge v. Goosby, supra, it is said:

"We think the court erred in holding that Goosby had acquired by prescription an easement over any of the land in controversy. There was no specific claim of right to so use it, and the property north of the Walker street fence, complained of, having been open, vacant, and uninclosed, a promiscuous use of it in approaching other streets is not sufficient to put the owner on notice of an adverse claim. Such a doctrine would require owners of suburban vacant lands either to fence or stand guard, at the peril of having their property burdened with easements in as many directions as the whim of the public or the lay of the land might turn the public foot steps."

We have carefully examined the evidence in the record, and conclude that it was not sufficient to authorize the submission of the issues of either dedication or prescription to the jury.

By its 10th and 11th propositions, appellant contends that the deed from Wm. McFaddin to the Magnolia Cemetery Company, appellee, did not convey the fee in the land, but only an easement over the roadway in question, and that said deed did not grant to appellee the exclusive use of said road-

way, and did not exclude appellant from the use of same.

In answer to this contention, appellee replies (1) that the deed from McFaddin to it conveyed the fee-simple title to the land in question; and (2) that if said deed did not convey the fee-simple title to the land to appellee, the evidence shows that no part of the land in question has ever been conveyed to appellant, and therefore appellant has no right in and to said roadway.

[9] The deed from McFaddin, after describing the 13 acres by metes and bounds, describes the roadway conveyed as follows:

"Also a roadway 30 feet wide commencing 30 feet east from the place of beginning of said tract. Thence in a line 30 feet from and parallel west (with) the first line of said tract to a point 30 feet pass the second or northeast corner of said tract; thence in a line 30 feet from and parallel with the second line of said tract to the Beaumont and Collier's Ferry road."

The habendum clause in the deed is: "To have and to hold the above described premises, together with all and singular the rights and appurtenances thereto in any wise belonging unto the said Magnolia Cemetery Company, its successors and assigns forever," followed by special warranty against all persons whomsoever claiming the same or any part thereof by, through, or under him, the said Wm. McFaddin.

It is not believed that the deed from McFaddin to the Magnolia Cemetery Company, appellee, conveyed the fee-simple title to the 30-foot strip of land, but that it conveyed an exclusive private right of way to be used in connection with the 13 acres conveyed for cemetery purposes, and as an appurtenant thereto. The deed first conveys by metes and bounds the 13 acres, and then conveys by adequate description the 30-foot strip therein denominated as "a roadway." Whether a deed conveying a way or road passes the fee to the land or only an easement in it, depends chiefly upon the terms of the conveyance. If the deed does not in terms convey the land or soil covered by the way, or include such land within the boundaries of the land conveyed, but merely grants a way in connection with the land conveyed, the grantee takes no interest or estate in the soil of such way." Jones on Easements, § 207.

[10] The language of the deed is free from ambiguity, and plainly shows that it was the intention of McFadden to grant a private easement to be used in connection with the 13 acres of land sold the Magnolia Cemetery Company for cemetery purposes. The conveyance was to appellee and its successors and assigns forever, and thus was an express grant of a private way to appellee appurtenant to the use of its 13 acres, and, that being so, did not create an easement in appellant, a stranger to the conveyance, nor confer any right therein to it.

But appellant says that McFadden, in granting to appellee the roadway, did so for the use of himself and adjoining land owners, as well as for appellee, and that, therefore, appellee did not acquire an exclusive use of the roadway by the deed. We do not think this contention has any support in the record. Unquestionably, the grant was to appellee and its successors and assigns, without reservations of any kind in favor of any one, and was thus an exclusive grant. While McFaddin owned the land adjoining that conveyed to appellee, a part of which was afterwards sold to appellant by one who succeeded to McFaddin's title, McFaddin did not, in his deed to appellee, reserve any rights as to an easement in or to the roadway for himself or any other subsequent owner of any portion of his land adjoining the roadway. When he sold the whole of the remainder of his tract, out of which appellee's 13 acres and roadway were taken, he made no mention whatever of the roadway or any reservation of any character therein, nor did he include any part of same in the land conveyed. So, we hold the grant to appellee by McFaddin was the grant of a private way, with the exclusive use thereof in connection with and as appurtenant to the 13 acres of land which he conveyed in the same deed.

[11] But appellant says that when it bought its three acres that it did so with reference to the roadway which had been established by McFaddin, and that when appellee platted its 13 acres, and dedicated same to cemetery purposes, as shown by the recorded plat thereof, it did so with reference to said roadway; wherefore appellant is entitled to have said roadway kept open for its use, and cites us to Oswald v. Grenet, 22 Tex. 94; Lamar County v. Clements, 49 Tex. 347, and a number of other authorities, as supporting this contention. We have carefully read all of the cases cited by appellant, and do not believe that any of them sustain appellant's contention, as applied to the facts in this case. Most of the cases cited are those containing some element of estoppel, and where roads have been sold, by those attempting to close up or interfere with the use of streets, by reference to a map showing the space or street sought to be closed, as being for the use of the public. This case, under the facts, does not fall within that rule. It is true that McFaddin, in his deed, conveys to the Magnolia Cemetery Company a 30-foot strip of land designated as a roadway. However, there is no declaration whereby he dedicates it to a public use. In plain, unambiguous words, he conveys it to the Magnolia Cemetery Company. He does not limit the completeness or the exclusiveness of this roadway conveyed by him to appellee. When he sells the remainder of his tract, 177 acres, to Fletcher, he makes no reference to said roadway, and

does not sell with reference thereto. When Fletcher sold the 177 acres to the Beaumont Improvement Company, he made no reference to said roadway, and did not sell with reference thereto. When appellant bought its 3 acres from the Beaumont Improvement Company, mention in the deed conveying the three acres was made to the northwest corner of said roadway, and called for the south line of the three acres to run along the north line of said roadway. This reference to the roadway was not by McFaddin, but by a successor in title of his, some, nearly, 8 years after he had conveyed the roadway to appellee. This could in no way be binding upon either McFaddin or appellee, or affect their rights in or to said roadway. Furthermore, appellant had full notice of appellee's exclusive right to said strip of land, as a roadway, when it bought the 3 acres. Mr. Daniell, the admitted agent of appellant, in purchasing its 3 acres from the Beaumont Improvement Company, had a copy of the deed from McFaddin to the Magnolia Cemetery Company, appellee, when he sought to purchase the land for appellant, and because of the clause therein conveying to appellee the roadway went to see and talked with Mr. Wiess, president of the Magnolia Cemetery Company, concerning said roadway. As to his conversation with Wiess, Daniell testified:

"The gist of the conversation had with Mr. Wiess, and which I stated to you yesterday, was to respect that road and not to trespass upon it; not to go upon it; that the road was there to the north of the cemetery, and as I was going to lay out a cemetery to the north on the 3-acre tract there, he wanted me to confine myself to the north line of that road. That is the gist of that conversation, 'stay off that road.' He gave me to understand that. As to whether I got the idea from Mr. Wiess that that roadway was open to me or anybody else; that wasn't discussed. That feature of it wasn't discussed; I didn't form any idea. I didn't consider the question of whether or not I would have the use of that road or anything else; whether it was private or public. I didn't consider that question at all. I didn't consider the question whether it was a road, or whose road. That phase of it wasn't discussed, because everybody knows what a road is; and he didn't state whether it was a public road or a private road, and I didn't ask. All he stated was stay off that road, which I did."

[12, 13] No estoppel against appellee could arise out of the statements made by Wiess to Daniell, for he made no admission or statements that could be interpreted to mean the roadway was for the use of the public, and, besides, appellant was bound to take knowledge of the legal effect of the deed from McFaddin to appellee, and of the nature and extent of the rights therein granted.

[14-18] Appellant's seventh and eighth propositions assert that appellee, for a valuable consideration, agreed with appellant that the strip of land or roadway should be kept open between the respective parties for their joint use. If it should be conceded that such agreement between the officers of the parties was made, still, appellee being within the knowledge of appellant a corporation with an active and acting board of directors, it devolved upon appellant to show that such agreement was authorized by the board of directors of appellee. No such authority was shown, and in the absence of such authority the agreement, if made, was not binding. Furthermore, the agreement if made was for the conveyance of an interest in the land; a perpetual easement; and not being in writing was in violation of the statute of frauds and therefore void. Article 1103, Vernon's Sayles' Civil Statutes; Parsons v. Hunt, 98 Tex. 425, 84 S. W. 644; Popham v. Eggleston (Tex. Civ. App.) 193 S. W. 182 (writ refused). But appellant says that the agreement was not only made, but that same was executed, carried out by the parties, and appellee, having received the benefits of said agreement, is estopped from invoking the statute of frauds against the enforcement of said agreement.

In order that a parol contract entered into in violation of the statute of frauds may be taken out of said statute, and the contract held enforceable, it must appear that the party insisting upon the contract has thereby been induced to act to his detriment, and that he will suffer loss if the contract is not enforced. We will not set out the evidence touching this issue, as same has been set out in the general statement of the evidence, supra, but will say that we fail to see where appellant has acted to its detriment, or expended money, because of the alleged contract, that will be lost to it in the absence of the enforcement of the claimed contract. Every dollar of the money spent by appellant was upon its own land, building fences that were needed, or would shortly have been needed. The ornamental fence on the front or side next to the Collier's Ferry road was built more cheaply by combining with appellee in the building of its fence, by reason of the enlarged contract. The gate mentioned was paid for entirely by appellee, and the saving to appellee of maintaining its long line of fence along the roadway also resulted in a like saving to appellant, as it relieved it from maintaining its fence on the opposite side of the roadway. It is not shown that appellant has spent any money for which it did not receive full value on its own property. So there is no detriment or loss shown that will be suffered by appellant in the absence of the enforcement of the alleged agreement. Moreover, the only interest or right that appellee had in the roadway, being a private easement or right of way, it could not, as a matter of law, create or impose by contract with appellant an additional burden or servitude on the soil of said roadway, and any effort to do so would

have been, and was, futile, and of no force. The owner of the dominant estate cannot change or alter the character or extent of the easement, nor subject the servient tenement to an additional burden. 10 A. & E. Enc. of Law (2d Ed.) 429; 14 Cyc. (b— Ways), pp. 1206–1209 (5); 19 C. J. § 227, p. 979; Jones on Easements, §§ 355 and 360.

[19] Appellant's twelfth proposition asserts that the court erred in peremptorily instructing a verdict for appellee, because the evidence showed that appellee, in constructing its fence along the north line of the strip of land or roadway in question, had encroached upon appellant's land some .8 of a foot, and whether this was so, being a question of fact, should have been submitted to the jury; and this, regardless of the other issues, necessitated a reversal of the case.

Appellant in its petition alleged that appellee "has wrongfully placed a fence just north of the north line of said street or roadway, and encroaching slightly on the property of plaintiff," etc., and prayed that the court by proper writ compel appellee to remove the fence from its present location. C. B. Daniell, an engineer and witness for appellant, testified:

"Since the Magnolia put up this new fence inclosing the roadway, and excluding the Jewish people from it, the Jewish people employed me to go there and make a measurement of that fence, and see if there was any encroachment on their land on the east end. I went there and started—there was a large cement post there, and I started in the center of the post and measured east and down that fence, and my recollection is, I don't know just where the memorandum I made of it is, but as well as I remember something about .8 of a foot; oh, probably about a foot of their driveway on the east side of the Magnolia Cemetery cuts something off like a foot of their land on the east end there; just cut off a corner; went diagonally across the corner there a little; come down here and went kind of across. Just by reference to this plat, as far as I know, the Magnolia people have got their fence right on the line. As far as I ascertained at that time, it is right on the line, but right at the southeast corner of the Jewish Cemetery people here, they had their corner there about .8 of a foot. Coming down this line, the driveway they have made from the Magnolia Cemetery up to what is known as the Penman switch property; now, they cut off about .8 of a foot or in the neighborhood of a foot, went out a foot or two beyond and foot or two this side. It is negligible. That is not enough to hurt anybody. They are on the Jewish Cemetery to the extent of something less than a foot, or about a foot, where they come up on a curve on the driveway and come along there. * * * I said it encroached .8 of a foot at the east end. I don't remember how far it is from the west side back over there. It is about a thousand feet or more, something like that. Eight or ten inches the other way, accurate measurement. I guess I measure about as accurate as they do. Eight or ten inches is not very far sometimes to be out in a thousand feet, for a good surveyor. As to whether it might have been 8 or 10 inches the other way, accurate measurement; I guess I measure about as accurate as they do. As to whether I would be willing to get up and say that line is over 8 or 10 inches; I stated to. you Mr. Orgain, and I will state again, according to my measurement, it was about .8 of a foot over, according to my measurement. Another man might come along and measure it, and I thought he was an accurate surveyor and find it right there. As I stated, the small distance is negligible, and I so treat it, because in that distance you are liable to that much error in a measurement; and I am just as liable to the error as anybody else; and they are just as liable as I am. I don't mean to say that when it comes to absolute location, it is on there. All I mean to say is, according to my measurement, I made it about .8 of a foot over, but I don't undertake to say they are over that far, except as indicated by my measurement. * * * I just measured the distance east and west, but I did run up here from this point here, where they have their fence. I did run over to the northwest, to their northeast corner, and I found the distance correct there. The only place I got off, or thought I got off—there is no fence that encroaches there, it is a curb there. The fence doesn't encroach. I think it runs about— the curb runs up to the fence, and the curb is over, it goes beyond the east side of the curb over about .8 of a foot. According to my measurement, no fence encroaches upon the Jewish Cemetery ground. It was the curb; and when I started from the point I ran the line with the fence to their northeast corner. I am sure about that."

This was all the evidence introduced to show encroachment. The undisputed evidence shows that no part of the fence encroaches upon the property of appellant, but Daniell says that the curb of appellee's road or driveway coming up to the southeast corner of appellant's land extended some .8 of a foot over. It appears that some time before this controversy arose, appellee purchased what is known as the Penman property (sometimes called the Tyrrell land), situated to the north and rear or east of the appellant's 3 acres, and the attempt on the part of appellee to obtain a 25-foot way or opening leading from appellee's 13 acres on the south of appellant's 3 acres, through said 3 acres to appellee's Penman property on the north of the 3 acres of appellant, eventuated in the present controversy. The failure to negotiate the passage through appellant's property resulted in appellee's making a road from its 13 acres around the rear or east side of appellant's property to the appellee's said property on the north; and according to Mr. Daniell's statement, the curb of this roadway leading to the rear or east of appellant's 3 acres at the southeast corner, in making the curve, extends something like .8 of a foot over. Under the allegations of appellant's petition, the roadway to the east of its 3 acres was not in controversy. The matter in issue was the location of the fence along the south line of appellant's 3

acres. The allegation of encroachment, as we construe the petition, is as to the fence between appellant's and appellee's property; that erected by appellee along the north line of the roadway, being the south line of appellant's 3 acres. The undisputed evidence of Daniell shows that this fence nowhere encroaches upon the property of appellant. Under the pleading and proof, no issue of encroachment was raised.

This interesting case, well pleaded and admirably briefed by both parties, has commanded and received our most careful and repeated consideration. Believing no issue was raised that should have been submitted to the jury, and hence that the judgment should be affirmed, it is so ordered.

Affirmed.

### On Motion For Rehearing.

Appellant has filed an elaborate motion for rehearing. We shall discuss only one of the propositions presented, as the others were fully covered in our original opinion.

[20] Appellant urges that we erred in holding that the agreement between the parties relative to the roadway was void under the statute of frauds, because no such defense was pleaded by appellee. Plaintiff's petition showed upon its face that the alleged agreement as to the roadway was an agreement made for the conveyance of an interest in land, a perpetual easement, and that same was not in writing. To this petition appellee answered by general demurrer, general denial, etc. Since the decision in Stovall v. Gardner, 100 Tex. 25, 94 S. W. 218, the rule is well settled that where the plaintiff's petition discloses upon its face a case that is within the statute of frauds, the defense afforded by said statute may be taken advantage of by general demurrer. In other words, when a plaintiff's petition shows upon its face that the cause of action asserted is within the statute of frauds, it is subject to general demurrer. The motion is overruled.